Ronita Faith BELL *v.* STATE of Arkansas

CR 97-1004 973 S.W.2d 806

Supreme Court of Arkansas
Opinion delivered September 17, 1998

*Steve Kirk* and *Michael Allison*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.

DONALD L. CORBIN, Justice. Appellant Ronita Faith Bell appeals the judgment of the Conway County Circuit Court convicting her of three counts of capital murder and sentencing her to life imprisonment without the possibility of parole. Our jurisdiction of this appeal is pursuant to Ark. Sup. Ct. R. 1-2(a)(2). Appellant raises five points for reversal: (1) the evidence was insufficient to support the jury's verdict; (2) the Attorney General's office improperly participated in the prosecution of the case; (3) the trial court should have declared a mistrial due to the State's mention of Appellant's post-arrest silence; (4) the trial court erred in allowing the State to present rebuttal testimony of two witnesses; and (5) the trial court erred in admitting into evidence a letter written by a codefendant. We affirm the judgment of conviction.

The record reflects that on the morning of July 26, 1996, at approximately 5:30 a.m., Albert Flakes, the nephew of Larry Flakes and the grandson of Dorothy Flakes, was driving by the Flakes' residence on Highway 64 in Menifee when he saw what he thought was a body lying in the driveway. Albert recognized

the body of his uncle's girlfriend Debra Yancy, which he described as having a bullet hole in her head. When Albert went inside the house, he saw that everything had been torn up and that his grandmother was not moving. Albert then went to look for his uncle Larry at 111 Alexander Street, a rented house where Larry ran a gambling establishment. When Albert arrived, there was no one there. Albert later went back to the Alexander Street house a second time, but there was still no one there. Finally, upon returning a third time, Albert found Appellant and her boyfriend Gregory Allen Cook at the house. Appellant and Cook had been living at the Alexander Street house and were employed by Larry Flakes at that time. Appellant and Cook did not let Albert into the house. Cook told Albert that he had not seen Larry. Cook showed no reaction when Albert told him what had happened at his grandmother's house.

Larry Flakes's body was subsequently found outside an abandoned house approximately one-half mile from the Flakes' residence on Highway 64. Larry Flakes died after being shot multiple times and stabbed in the neck. Both Dorothy Flakes and Debra Yancy died as the result of gunshot wounds. Yancy also had postmortem injuries on her body that were consistent with her having been run over with a car. Officers discovered Larry Flakes's 1989 Chevrolet Blazer near Maumelle, on an old logging road behind a liquor store. The vehicle was completely burned.

Officers recovered multiple 9-mm bullets and shell casings in and around the Flakes' residence on Highway 64. They also recovered the following items from the house on Alexander Street: one spent lead bullet found on the floor; one bullet lodged in the wooden floor; three bullet holes in the floor of the front room and one in the wall; two bloody footprints; and a dish towel, a pair of blue and white tennis shoes, a pair of white gloves, and a pair of boxer shorts with blood stains on them. Officers also recovered a sales receipt from the Price Cutter store in Conway; the date and time of the receipt were Friday July 26, 1996, at 3:54 a.m. The receipt showed that the following items were purchased: Pine Sol, 9-Lives cat food, 9-Lives dinner, sausage pizza, hamburger pizza, Tidy Cat 3 cat litter, and King Edward Imperial cigars.

Officers submitted the items of evidence to the Arkansas State Crime Laboratory for analysis. Tests performed at the crime lab revealed that six bullets and shell casings recovered from the two residences and two bullets taken from the body of Larry Flakes had been fired from the same firearm barrel, which had rifling characteristics consistent with a 9-mm Luger firearm. DNA comparisons revealed that blood samples taken from the blue and white tennis shoes found in the bedroom at the Alexander Street residence had the same types of chromosomes found in Larry Flakes's blood. The DNA analysis revealed further that the estimated chance of finding those types of chromosomes in an unrelated person at random is approximately one in two million in the black population.

Arkansas State Police Investigator W.B. Baskin performed a luminol test at the Alexander Street house, which revealed the presence of animal or human blood, not visible to the naked eye, that had apparently been cleaned from the floor of the front room. The test also revealed an apparent trail of blood, indicating to Baskin that a body had been laying in the house and had been dragged toward the back of the house and out the back door.

Appellant and Cook, along with Patrick Charles Walker and Christopher B. Johnson, were subsequently charged with three counts of capital felony murder, for having killed the victims in the course of and in furtherance of a robbery, under circumstances manifesting an extreme indifference to the value of human life. Appellant was tried in June 1997 and was convicted of all three counts. The State had waived the death penalty against Appellant, and she was accordingly sentenced to life imprisonment without the possibility of parole.

## I. Sufficiency of the Evidence

Appellant's first argument for reversal is that there is insufficient evidence to support the jury's verdicts against her. Appellant contends that the proof at trial was insufficient to establish that she had acted with the requisite mental state of purposely acting to promote or facilitate the crimes. We disagree.

■ When a defendant challenges the sufficiency of the evidence convicting her, the evidence is viewed in the light most favorable to the state. *Bailey v. State*, 334 Ark. 43, 972 S.W.2d 239 (1998). Evidence, whether direct or circumstantial, is sufficient to support a conviction if it is forceful enough to compel reasonable minds to reach a conclusion one way or the other. *Wilson v. State*, 332 Ark. 7, 962 S.W.2d 805 (1998). We do not, however, weigh the evidence presented at trial, as that is a matter for the factfinder; nor will we weigh the credibility of the witnesses. *Id.* Only evidence supporting the verdict will be considered. *Bailey*, 334 Ark. 43, 972 S.W.2d 239.

■ Appellant and the three codefendants were charged as accomplices to the crimes. An accomplice is defined as:

> one who, with the purpose of promoting or facilitating the commission of an offense, either solicits, advises, encourages, or coerces another person to commit the offense, aids, agrees to aid, or attempts to aid the other person in planning or committing the offense, or, having a legal duty to prevent the offense, fails to make a proper effort to prevent the commission of the offense.

*Williams v. State*, 329 Ark. 8, 16, 946 S.W.2d 678, 682 (1997) (citing Ark. Code Ann. § 5-2-403 (Repl. 1993)). A defendant's presence at the crime scene or failure to inform law enforcement officers of a crime does not make one an accomplice as a matter of law. *Id.* Relevant factors in determining the connection of an accomplice to a crime are: (1) the presence of the accused in proximity of a crime, (2) the opportunity to commit the crime, and (3) an association with a person involved in the crime in a manner suggestive of joint participation. *Britt v. State*, 334 Ark. 142, 974 S.W.2d 436 (1998). In order to sustain a conviction of capital felony murder, it is not necessary that the defendant be shown to have taken an active part in the killing as long as he or she was an accomplice and had the requisite intent to commit the underlying felony. *Id.*

Appellant was arrested in November 1996 and gave two interviews to police at that time. Investigator Dewayne Luter of the Arkansas State Police testified that he interviewed Appellant on November 19, and that she made the following statements.

Appellant and Cook had driven to Maumelle on July 25, 1996, to pick up Chris Johnson, whom she called "Chaos," and a male known to her as "Mr. P.," later identified as Patrick Walker. The four of them drove back to the house on Alexander Street in Menifee. Appellant then telephoned Larry Flakes to ask him to come over, because Flakes was going to give some money to her, so that she and Cook could go to a funeral out of state. Appellant was in the bedroom when she heard a vehicle arrive and someone come into the house; she was still in the bedroom when she heard gunshots. About five minutes later, Appellant came out of the bedroom and saw Larry Flakes lying on the floor. Appellant saw Johnson use his foot to turn Larry over onto his back; Johnson then took money and some dope from Larry's body. They then took a sheet off the couch and wrapped it over Larry and loaded the body into Larry's Blazer. Appellant and Cook stayed at the house and cleaned up the blood while Johnson and Walker left in Larry's Blazer. Johnson and Walker were gone for fifteen to twenty minutes, and when they came back, Johnson was very excited and "hyper" and told Appellant and Cook that he had shot a woman. Johnson told them that he made the girl wake up Larry's mother and then shot her. Johnson and Walker left again in Larry's Blazer and Appellant and Cook took their vehicle and met up with Johnson and Walker in Maumelle, on the side of an old country road. Johnson then proceeded to take some items from the Blazer, namely rifles, shotguns, and some clothes that Larry Flakes had been selling, and loaded them into the trunk of the car occupied by Appellant and Cook. They then poured some liquor on the Blazer, and Johnson set the vehicle on fire. Appellant and Cook took Walker and Johnson to their respective houses; Johnson took the clothes and guns with him. Afterwards, Appellant and Cook went to Cook's grandmother's house for a few minutes and then drove around Conway for awhile, where they were stopped by the police. Finally, Appellant and Cook returned to the house on Alexander Street. Investigator Luter stated that the following day, November 20, 1996, Appellant contacted him about her previous statement. He stated that during that interview, Appellant told him that Cook had not stayed at the residence with her, but had actually left with Johnson and Walker in Larry's Blazer, while she stayed at the house alone and cleaned up

the blood. He stated that Appellant also told him that Walker had a black-handled knife.

Conway County Sheriff Mark Flowers, who was present during the two interviews with Appellant, testified that during those interviews, Appellant appeared calm and never talked about being scared of anyone, or about needing any protection from anyone.

Cassandra Baskin, who lived at 10 Alexander Street in Menifee, testified about her relationship with Appellant. Baskin stated that Appellant had lived with her in 1994 and 1995 and had gone to school with Baskin's children. For about two weeks in May 1996, Appellant and Cook moved in with Baskin. During that time, Baskin introduced Appellant to Larry Flakes at Flakes's house on Highway 64. While the three of them were inside the house, Baskin concluded that Appellant and Flakes were engaged in sexual activity. The night before the bodies were discovered, around midnight, Baskin had been to a club owned by David Hood in Menifee. She saw Larry Flakes there talking with Hood. Approximately an hour or an hour and one-half later, Baskin saw Larry Flakes's Blazer followed by Appellant and Cook's vehicle traveling down Alexander Street toward Highway 64. Baskin watched as the two vehicles turned onto Interstate 40. Baskin stated that the last time she saw Larry Flakes alive was at the club.

Angela McGowan testified that she had shared a cell with Appellant in the Conway County Jail and that Appellant had talked to her about the homicides. Appellant told McGowan that they had obtained the gun from a man named "Fat Mack," and that the gun had later been thrown in a field in Maumelle. On separate occasions, Appellant told McGowan that different people had shot the victims — one time Appellant stated that Chris Johnson did it, and another time she stated that Patrick Walker did it. Appellant told McGowan that they had shot Debra Yancy, Larry Flakes's girlfriend, and that Yancy had tried to run, but they ran over her with the car. Appellant also told McGowan that they took Larry Flakes's Blazer to Maumelle and burned it. When asked by the prosecutor if Appellant had told her about any money being recovered, McGowan stated that Appellant told her that

there was a bag of money, but that they never did get it. McGowan stated that during the times that she talked with Appellant about the crimes, she formed the impression that Appellant was part of the plan. McGowan stated further that during their conversations, Appellant never told her that she was scared of anyone.

Scarlet Dehart testified that she, too, had shared a cell with Appellant in the Conway County Jail for about seven weeks. Dehart stated that Appellant first told her that she did not have anything to do with the murders, but later changed her position. Dehart stated that on the day that Appellant made her first court appearance, Appellant came back from court mad because she thought that she was going to get out of jail. Appellant told Dehart that the cops were stupid, that they did not know what they were doing, and that she did know something about the crimes. Dehart stated that about one week later, Appellant became really upset about an accusation, apparently made by her mother, that she had slept with Larry Flakes. Appellant told Dehart that she had been involved with Flakes, but that no one could prove it. Appellant also told her that she had only slept with Flakes on one occasion, after she had done two lines of cocaine. On another occasion, Appellant again told Dehart that the police officers were stupid, because they thought the gun used was a 9 mm, but that it was actually a Tec-9. On another date, while Appellant and Dehart were in court, Appellant commented that a defense attorney reminded her of "Fat Mack," the man that had provided them the gun. Appellant later told Dehart that David Hood had hired them for $2,000 each to "take care of Larry," because Larry had failed to turn over some drug money and also owed money to Hood for outstanding amounts of drugs.

Dehart stated that Appellant described her participation in the crimes as follows. The defendants went to the place where Larry Flakes was and they "busted in" on him. Greg Cook had the gun. Flakes said that he had not done anything to them and that he would give them whatever they wanted. Flakes then began talking to Cook about Appellant, calling her derogatory names and saying that she was not worth it. Appellant then went over to Cook and said, "Let me do it." Cook handed her the gun.

Appellant pointed the gun between Flakes's eyes and said, "Now, talk shit." Flakes then said, "No, don't do this," but Cook said, "Do it." Cook shot Dorothy Flakes between the eyes while she was asleep; Chris Johnson shot the girl, Debra Yancy, in the back and then ran over her. They took Larry Flakes's Blazer to Lake Maumelle and burned it, using liquor to ignite it, so that any remaining fingerprints would not be discovered. They also took about $50,000 from the Flakes home, but did not give the money to David Hood; instead, they kept the money for themselves, telling Hood that they did not find any money. Cook kept his and Appellant's share of the money and later used it to hire his attorney. Dehart stated that Appellant was mad about that because she was not able to hire an attorney and, instead, had to have the public defender.

Dehart testified further that Appellant had talked to her about being in a gang and had explained to her the different levels of disciples in the gang. Appellant told Dehart that she was a Hoover Disciple and that Cook was a Black Disciple. Appellant told her that she shot Flakes in order to position herself in Cook's gang as his "queen." Appellant also told her that she did it to earn respect from Cook for standing up for her man and proving that she did not have anything to do with Larry Flakes. Dehart stated that while Appellant was telling her about the gang information, Appellant was boastful. Dehart stated further that Appellant bragged about the crimes, and that Appellant "didn't have any remorse in what was done, that, you know, when the young woman's head got run over, that was a game[.]"

Appellant took the stand in her defense and related the following information to the jury. She testified that she and Cook picked up Johnson and Walker in Maumelle and brought them back to Menifee because Johnson wanted to buy some drugs from Larry Flakes. She stated that she had seen Johnson with a gun while they were in Maumelle, but that she did not know that he brought it with him to Menifee. Contrary to what she told Investigator Luter about Flakes bringing her some money to go out of state, Appellant stated that the reason she called Flakes that night was so he could bring over some drugs to sell to Johnson. She stated that Johnson told her to clean up the blood and that she

was afraid of him because he had a gun in his hand and because he had once threatened to break her cousin's neck. She admitted, however, that she and Cook later met up with Johnson and Walker on a dirt road in Maumelle, and that they took Johnson and Walker home after Johnson had burned the Blazer. She stated that they put the stolen clothes and guns in the storage shed. She stated that when she was initially arrested she denied any involvement or knowledge of the shootings because she was scared of Johnson and what he might do to her mother or her little brother. She asserted that she only later admitted to being present when the murder occurred, because the police had assured her that Johnson was in jail and was not able to get to her mother.

On cross-examination, Appellant stated that she knew Larry Flakes carried large sums of money, and that she had sometimes counted the money for him. She again asserted that Johnson told her to clean up the blood and that he was holding the gun when he told her this. Appellant stated: "I was going to do what he said. . . . Even when he wasn't there. . . . He's got gang friends. They know where my mother stay [sic]." She then stated that although she knew gang members, she was not in a gang, but that Johnson was in a gang. When asked why her statement to police made no mention of her claim that she had called Larry Flakes over to the Alexander Street house to sell some drugs to Johnson, as opposed to calling him to borrow some money to go to an out-of-state funeral, Appellant claimed that she had told the police, but they did not write it down.

On rebuttal, Stephanie Russell testified that she had shared a cell with Appellant at the Conway County Jail and that Appellant had asked her about different members of the Flakes family. Russell stated that Appellant told her that the Flakes family had better hope that she didn't get out of jail, and that "if she did she was going to call some of her homies . . . and that she would have Menifee wiped off the map."

██ ██ Based on the foregoing evidence, we conclude that there was sufficient evidence presented at trial showing that Appellant had acted with the purpose of promoting or facilitating the robbery of Larry Flakes, and that she assisted or aided in the

commission of the crimes for which she was convicted. There was sufficient evidence that Appellant was the one who telephoned Larry Flakes and lured him to the Alexander Street house, where he met his death. There was also evidence, including Appellant's own testimony, that she cleaned up the blood after Larry Flakes was killed and then helped dispose of the evidence, including the destruction of the victim's Blazer. Moreover, the jury heard testimony from Angela McGowan and Scarlet Dehart concerning Appellant's willful participation in the crimes from beginning to end. The jury has the sole authority to evaluate the credibility of witnesses and to apportion the weight to be given to the evidence. *Parker v. State*, 333 Ark. 137, 968 S.W.2d 592 (1998). It is for the jury to resolve any questions of conflicting testimony and inconsistent evidence, and the jury may choose to believe the State's version of the facts over the defendant's. *Id.*; *Sanford v. State*, 331 Ark. 334, 962 S.W.2d 335 (1998).

## II. *Assistant Attorney General's Participation in the Trial*

Appellant's second point for reversal is that the trial court erred in denying her motion to have Assistant Attorney General Kent Holt barred from participating in the prosecution of her case. In support of this argument, Appellant relies on Ark. Code Ann. § 16-21-2004(d) (Repl. 1994), which states that all deputy prosecutors for the Fifteenth Judicial District, of which Conway County is part, shall reside in the Fifteenth Judicial District.[1]

The State argued below that because Mr. Holt was appointed by the prosecuting attorney and was administered the oath of office by the circuit court, he was entitled to participate in the trial as a special deputy prosecutor. Moreover, the State argued that because Mr. Holt was not being paid through the county's quorum court, the residency requirement for deputy prosecutors did not preclude his participation in the case. The trial court ruled that, although Mr. Holt, as a special deputy prosecutor, may not have had the authority to bring charges against anyone for crimes committed within the Fifteenth Judicial District, his assistance in

---

[1] Section 16-21-2004(d) provides an exception to the residency requirement for the deputy prosecutor in Scott County.

Appellant's case was not precluded because the case was being pursued in the name of the prosecuting attorney for that district.

On appeal, the State contends that Mr. Holt was a *de facto* official, and as such, Appellant's challenge to his authority to assist the prosecutor is barred because she failed to attack that authority in a direct proceeding. The State relies on the holdings in *State v. Roberts*, 255 Ark. 183, 499 S.W.2d 600 (1973), and *Chronister v. State*, 55 Ark. App. 93, 931 S.W.2d 444 (1996), to support its argument.

In *Roberts*, 255 Ark. 183, 499 S.W.2d 600, the defendant challenged the authority of the deputy prosecutor to try him on the ground that he had not been reappointed after the elected prosecutor, who had originally appointed the deputy prosecutor, began his second term. This court recognized that the deputy prosecutor was a *de facto* official and that, as such, the defendant was required to challenge his authority in a direct proceeding, rather than in the criminal proceeding against him. Relying on a decision from the Supreme Court of Tennessee, this court outlined what constitutes a collateral attack:

> [There] can be gleaned several guidelines for determining whether a particular attack upon the title of a public official is "collateral." By the very definition of the word if the attack is secondary, subsidiary, subordinate, i.e., related to the main matter under consideration but not strictly a part thereof, the attack is indirect and collateral. If the official's title is questioned in a proceeding to which he is not a party or which was not instituted specifically to determine the validity of his title the attack is collateral. If the title of the officer is questioned in a proceeding in which he is a party merely because he is acting in his official capacity the attack is collateral. Lastly if the attack is made because it is necessary to show the officer's want of title to lay a basis for some other relief the attack is collateral. . . .

*Id.* at 186-87, 499 S.W.2d at 602 (quoting *Smith v. Landsden*, 370 S.W.2d 557 (Tenn. 1963)). This court ultimately held that the deputy prosecutor was, through the acquiescence of the circuit court, at least a *de facto* official; hence, the attack made upon his authority to act constituted a collateral attack and could not be made under the law.

In *Chronister*, 55 Ark. App. 93, 931 S.W.2d 444, the defendant challenged the authority of the city's prosecuting attorney to prosecute him for a state criminal violation. He argued that the city attorney of a first-class city was authorized to perform only such duties as are assigned to him by city ordinance, and that Russellville City Ordinance No. 988 authorized the city attorney to prosecute municipal violations, but made no mention of state law violations. He argued further that Ordinance No. 1411 prohibited the city attorney from engaging in the practice of law except for his duties as city attorney. He contended that the prosecuting attorney's written authorization, in compliance with Ark. Code Ann. § 16-21-115 (1987), authorizing the city attorney to prosecute misdemeanor violations of state law occurring within the city limits was without effect because the city had expressly limited the city attorney's authority.

■ The court of appeals affirmed the trial court's judgment on the ground that the city attorney was a *de facto* official, holding:

> A *de facto* official is one who by some color of right is in possession of an office, and performs its duties with public acquiescence, though having no right in fact; the acts of *de facto* officials may not be questioned based upon of the lack of legal authority except by some direct proceeding instituted for the purpose by the State or by someone claiming the office *de jure*, or when the person himself attempts to build up some right, or claim some privilege by reason of being the official he claims to be; in all other cases, the acts of an officer *de facto* are as valid and effectual while he retains the office as if he were an officer by right, and the same legal consequences will flow from them for the protection of the public and third parties.

*Id.* at 95, 931 S.W.2d at 445 (citing *Faucette, Mayor v. Gerlach*, 132 Ark. 58, 200 S.W. 279 (1918)). Relying on this court's holding in *Roberts*, the court of appeals held that the attack on the city attorney's authority constituted a collateral attack, as the prosecuting attorney had authorized the city attorney to prosecute misdemeanors in accordance with statute, the city attorney had acted under that authorization, and the circuit court had recognized the city attorney's authority.

■ Here, the record reflects that the charges against Appellant were filed by the elected prosecutor for the district, Jerry Don Ramey, and that the investigation of the case was at the direction of the prosecutor's office. Mr. Holt was appointed as a deputy prosecutor by Mr. Ramey for the purpose of assisting Ramey in the prosecution of these murders. Mr. Holt was administered the oath of office by the circuit court as a deputy prosecutor on May 19, 1997; hence, the circuit court recognized Mr. Holt's authority to participate in the proceedings against Appellant. Based on the foregoing case law, Mr. Holt was at least a *de facto* official. As such, Appellant's challenge to his authority made during her criminal trial was a collateral attack, and as such, cannot be maintained under the law.

■ Furthermore, Appellant has not demonstrated how she was prejudiced by Mr. Holt's participation in her prosecution. At trial, Appellant argued that it would prejudice her case if the jury were told that an assistant attorney general was participating in her case, asserting that such information would lead the jury to believe that Appellant's case was of more importance than any other criminal trial. This alleged prejudice never materialized, however, because the State agreed that it would only identify Mr. Holt as a deputy prosecutor, without mentioning his employment with the Attorney General's office. This court has repeatedly stated that prejudice is not presumed, and we will not reverse absent a showing of prejudice. *Clark v. State*, 323 Ark. 211, 913 S.W.2d 297 (1996); *Solomon v. State*, 323 Ark. 178, 913 S.W.2d 288 (1996). Accordingly, we conclude that the trial court correctly denied the motion, even if for the wrong reason, and we affirm its decision. *See Huggins v. State*, 322 Ark. 70, 907 S.W.2d 697 (1995); *Hagen v. State*, 315 Ark. 20, 864 S.W.2d 856 (1993); *Register v. State*, 313 Ark. 426, 855 S.W.2d 320 (1993).

### III. Testimony of Appellant's Post-Arrest Silence

For her third point for reversal, Appellant argues that the trial court erred in refusing to declare a mistrial when Investigator Luter testified about Appellant's initial decision not to give a statement, after she had been informed of her *Miranda* rights. She relies on the Supreme Court's holding in *Doyle v. Ohio*, 426 U.S.

610 (1976), and asserts that the State deliberately brought her post-arrest silence to the jury's attention. The State contends that the testimony elicited by the prosecutor is not violative of the holding in *Doyle*, as Appellant's post-arrest silence was not used to impeach her testimony at trial.

The record reflects the following direct examination of Investigator Luter by the prosecutor:

BY MR. RAMEY:

Q. [D]id you have occasion to sit in on a statement by Ms. Bell?

A. Yes, I did.

Q. Before this statement was given was Ms. Bell advised of her, what we call Miranda Rights?

A. Yes, she was.

Q. Could you describe to the ladies and gentlemen of the jury what the Miranda Rights are?

A. Ms. Bell was advised that she had the right to remain silent, she had the right to consult an attorney and have an attorney present if she — if she could not afford one, one would be appointed for her at no cost. And basically, her rights were explained to her.

Q. Did she voluntarily talk with you or did she decide to exercise her Miranda Rights?

A. The first time she didn't want to make a statement.

BY MR. KIRK: Your Honor, may we approach?

At that point, the following colloquy occurred at the bench, out of the hearing of the jury:

BY MR. KIRK: I object to the bringing out of her post duress [*sic*] silence in front of the jury. We talked about this the other day and the State specifically agreed to tell their officers not to bring that up.

BY MR. RAMEY: . . . agreed to any instruction by the Court to disallow any statement.

BY MR. HOLT: Or disregard the last —

By Mr. Ramey: Or, disregard the last comment. And I'll pass by all that, Your Honor.

By Mr. Kirk: Well, I'd move for a mistrial based on that statement.

By The Court: Which statement are you referring to?

By Mr. Kirk: That the first time she refused to give a statement to him the first time she was asked.

By The Court: Okay. Your motion for mistrial is denied. I will instruct the jury to disregard the witness's last statement. Will that meet your objection?

By Mr. Kirk: All right. Thank you, Your Honor.

Following the conversation at the bench, the trial court instructed the jury to disregard the witness's last statement. There was no further mention of Appellant's post-arrest silence during the remainder of the trial. Appellant now contends that the trial court erred in refusing to grant her motion for mistrial. We disagree.

 "A mistrial is a drastic remedy that should be granted only where the error is so prejudicial that justice cannot be served by continuing the trial or where the fundamental fairness of the trial itself has been manifestly affected." *Williams,* 329 Ark. 8, 20, 946 S.W.2d 678, 684 (citing *Peeler v. State,* 326 Ark. 423, 932 S.W.2d 312 (1996)). The trial court is afforded broad discretion in ruling on a motion for mistrial, and a mistrial will not be declared when the prejudice can be removed by an admonition to the jury. *Id.*

 In *Numan v. State,* 291 Ark. 22, 722 S.W.2d 276 (1987), this court discussed the Supreme Court's holding in *Doyle* that questioning a defendant about his or her silence during and after receiving *Miranda* warnings violated the due process clause of the Fourteenth Amendment. The Court held:

> [W]hile it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence *to be used to*

> *impeach an explanation subsequently offered at trial.* [Footnote omitted.]

*Id.* at 24, 722 S.W.2d at 277 (quoting *Doyle,* 426 U.S. at 618) (emphasis added). Where, however, a comment on the defendant's post-arrest silence is not an attempt to impeach the defendant, it is not the type of comment prohibited by the Court in *Doyle,* 426 U.S. 610. *Ferrell v. State,* 325 Ark. 455, 929 S.W.2d 697 (1996).

In *Greer v. Miller,* 483 U.S. 756 (1987), the Court held that there was no *Doyle* violation where a question was asked by the prosecutor that touched upon the defendant's post-arrest silence, but was followed by an immediate objection sustained by the trial court and an admonishment to the jury that it should disregard any questions to which objections were sustained. In further distinguishing *Doyle,* the Court stated that the prosecutor was not allowed to impeach the defendant with the silence, nor was the prosecutor otherwise permitted to call attention to the defendant's silence.

■ Here, the only reference to Appellant's post-arrest silence was made by a witness in response to one question by the prosecutor. The silence was not used to impeach Appellant's testimony, and there was no further reference made by the prosecutor, either during examination of the witnesses or during closing argument, concerning Appellant's initial decision to invoke her *Miranda* rights. Moreover, once the objection was made, the trial court immediately instructed the jury to disregard the witness's answer. As such, we conclude that there was no *Doyle* violation.

■ Moreover, Appellant's counsel indicated below that the trial court's decision to admonish the jury to disregard the statement satisfied the objection to the testimony. The record reflects that when the trial judge informed defense counsel that he would instruct the jury to disregard the officer's last statement, he specifically asked counsel if that instruction would meet counsel's objection. Defense counsel then stated, "All right. Thank you, Your Honor." This court has repeatedly stated that it adheres to the familiar principle that a defendant may not agree with a ruling by the trial court and then attack that ruling on appeal. *McGhee v.*

*State,* 330 Ark. 38, 954 S.W.2d 206 (1997); *Goston v. State,* 326 Ark. 106, 930 S.W.2d 332 (1996); *Meadows v. State,* 324 Ark. 505, 922 S.W.2d 341 (1996).

## IV. *Rebuttal Evidence*

For her fourth point on appeal, Appellant argues that the trial court erred in allowing the State to present the rebuttal testimony of Arkansas State Police Officer Freddie Williams, concerning gang symbols used by Greg Cook and a tattoo worn by Cook, and the testimony of Stephanie Russell, concerning threats Appellant made to her directed at the victims' families. Appellant asserts that such testimony was improper rebuttal evidence and that the State should have included such evidence in its case-in-chief. The State argues that the rebuttal testimony was presented in response to the testimony elicited during the defense's case from both Cook and Appellant, and that it went to the issue of their credibility. The State contends that both witnesses denied any gang affiliation, and that Appellant claimed to have only participated in the events surrounding the murders due to her fear of Chris Johnson's gang connection. The State contends further that Russell's testimony, that Appellant threatened to get her "homies" to "have Menifee wiped off the map," was proper to refute Appellant's claim that she acted out of fear of Johnson and that she only gave statements to the police after Johnson was arrested.

Admissibility of rebuttal evidence lies within the discretion of the trial court, and we will not reverse absent a showing of abuse of that discretion. *Smith v. State,* 334 Ark. 190, 974 S.W.2d 427 (1998); *Schalski v. State,* 322 Ark. 63, 907 S.W.2d 693 (1995). Genuine rebuttal is evidence that is offered in reply to new matters. *Anthony v. State,* 332 Ark. 595, 967 S.W.2d 552 (1998). The fact that the State could have presented the testimony in its case-in-chief does not preclude its introduction on rebuttal if it serves to refute evidence raised by the defense. *Isbell v. State,* 326 Ark. 17, 931 S.W.2d 7 (1996); *Asher v. State,* 303 Ark. 202, 795 S.W.2d 350 (1990), *cert. denied,* 498 U.S. 1048 (1991); *Birchett v. State,* 289 Ark. 16, 708 S.W.2d 625 (1986). Here, the rebuttal evidence was in response to testimony elicited by the defense during its case. Accordingly, the trial court did not abuse

its discretion in allowing the State to present the testimony of Russell and Williams.

### V. Letter Written by Greg Cook

For her last point on appeal, Appellant argues that the trial court erred in allowing the State to introduce into evidence a letter written by Greg Cook, intended for codefendant Patrick Walker, on the grounds that the letter was irrelevant and highly prejudicial. Specifically, Appellant takes issue with the following statements contained in the letter:

> It's fucked up that we shouldn't be on trial because look at what they got on the other suspects. . . . I believe the Judge is crooked himself. . . . You have to deny your statement and say they scared you into make [sic] that false statement all right? . . . Oh, yeah, Lil Psycho will tell you how weak those low ass niggers is [sic]. . . . Flush this down the toilet because they [sic] looking for any reason to convict us.

The State asserts that the letter was properly admitted to impeach Cook's credibility by showing that he had attempted to influence a potential witness's testimony.

Appellant offers no citation to authority in support of this point, nor does she offer any convincing argument as to how the letter, written by another person, was prejudicial to her case. Moreover, we agree with the State that the admission of this letter went to the issue of Cook's veracity and credibility. It is settled law that matters pertaining to the admission of evidence are within the sound discretion of the trial court, and we will not reverse such a ruling absent an abuse of that discretion. *Jameson v. State*, 333 Ark. 128, 970 S.W.2d 785 (1998); *Newman v. State*, 327 Ark. 339, 939 S.W.2d 811 (1997).

### IV. Rule 4-3(h)

In accordance with Rule 4-3(h) of the Arkansas Supreme Court Rules, the record has been reviewed for adverse rulings objected to by Appellant but not argued on appeal, and no reversible errors were found. For the aforementioned reasons, the judgment of conviction is affirmed.