JOHN DAN KEMP, Chief Justice
A Miller County jury found appellant Virginia Hyatt ("Virginia") guilty of the capital murder of Patricia Wheelington ("Patricia").[1] Virginia was sentenced to a term of life imprisonment without the possibility of parole. For reversal, Virginia contends that the circuit court erred by denying her motion for directed verdict on the charge of capital murder because the State failed to prove that she committed the murder or that she acted with premeditation and deliberation. We affirm.
I. Facts
A. Before the Murder
Virginia and her husband, James Hyatt ("James"), met Patricia and her husband, Ray Wheelington,[2] at the Guys & Dolls Club (the "Club") in Texarkana, where Patricia and Ray taught square dancing. Virginia and James attended dances and lessons at the Club. In 2009, James and Patricia began having an affair.
James, along with several members of the Club-Eddy "Reese" Baker, Harvey Cook, Barbara Ricketts, and Phyllis Nabors-testified that Virginia is a jealous person and that she would frequently accost other women who attempted to dance with James at Club events. Barbara testified that Virginia often complained about marital problems and blamed everything on Patricia. Multiple witnesses testified that they had heard Virginia say that she hated Patricia.
In November 2013, James decided to divorce Virginia. He testified that he had contemplated divorce for a while and that he and Virginia had been sleeping in separate bedrooms for at least ten years. James stated that he finally decided that *675 he had to leave because he was afraid that Virginia was going to kill him. His fear stemmed, in part, from conversations he had with his sisters and his knowledge that Virginia had a gun.
James testified that the week before Thanksgiving 2013, his sisters told him that they feared Virginia might harm him. His sister Sheila told him that she "[had] word through [one of their relatives] that Virginia Ann is concerned about you committing suicide because of your failed relationship with [Patricia]." James said that suicide was the "[f]urthest thing from [his] mind," but after hearing what Virginia had said, he "believed [he] was dead." James retained a divorce attorney but asked that the attorney not file the divorce complaint until he was safely out of town for fear that Virginia would harm him or Patricia.
James knew that Virginia had a .38-caliber revolver that he had purchased for her, and he said that Virginia was "a lot better shot than [he] was." On Thursday, November 28, 2013, during Thanksgiving dinner, Sheila asked Virginia if she still had the gun. Virginia responded that she and James lost the gun during their move from Doddridge to Texarkana.
1. Friday, November 29, 2013
On Friday, November 29, while Virginia was visiting her mother at a nursing home, James left town with his sister Debra and headed to Miami, Florida. He testified that Debra took him to Florida to "save [his] life." Virginia called James several times while he was traveling. James answered the first call and told Virginia that he was leaving and was not coming back. Patricia had left town that morning for a trip to New Orleans. James said that he called Patricia repeatedly and told her that she should not return to Texarkana because Virginia was distraught.
That afternoon, Virginia called Phyllis, "hysterical" and "just screaming he's gone, he's gone." Virginia told Phyllis that James was with Patricia. Phyllis and Virginia spent part of the afternoon driving around to look for James. Virginia also called Patricia's cell phone that afternoon and left four voicemail messages between 2:16 p.m. and 2:22 p.m. In the audible portions of the voicemail messages, Virginia can be heard pleading with Patricia to send James back to her.
2. Saturday, November 30, 2013
Virginia left Patricia another voicemail message at 7:58 a.m. on Saturday, November 30, stating, "Patty, please, please give me my husband back. Please give me my husband back. Please, it's horrible. I need my husband back. You can get any man you see anywhere. Please give me my husband back, please. Call me back. Are you there? Can you hear me? Please call me back."
3. Sunday, December 1, 2013
Virginia called Club member Reese Baker on Sunday morning, asking if he knew where James and Patricia were. Virginia told Reese that James had left her on Friday and that she believed James and Patricia were together. Reese said that Virginia told him that she had driven by Patricia's house "at least twice" that weekend to see if James was there. She also drove by several motels looking for James's or Patricia's vehicle. Virginia called Reese again on Sunday afternoon and asked him if he had heard from either James or Patricia. Reese told her that he had not.
That night, Barbara, Phyllis, Harvey, and Patricia played cards at Barbara's house. Phyllis testified, "I told [Patricia] ... I will try to keep Virginia away from you. I know she's going to harass you, you know, she just won't get it out of her mind that you and James were together. And *676 [Patricia] said, well, if you're going to be with Virginia maybe you know I'll just kind of distance myself a little bit from you." Phyllis responded, "[W]ell, if I know where you are then I'll know where not to take her."
4. Monday, December 2, 2013
Early Monday morning, Virginia went to Patricia's house and confronted her. At 7:41 a.m., Patricia texted James and said, "Virginia is here at the house and wants you to call her." James testified that he called Virginia while she was on the porch with Patricia and told her to leave Patricia alone. He told Virginia that he was out of state and that he was not coming back. At 7:48 a.m., Patricia texted James again, stating, "Thank u, she left." That afternoon, Phyllis sent a text message to Patricia and said, "Just talked to virginia I am sorry she came out there I told her that is exactly why she dont have a husband but she want [sic] listen."
On Monday evening, several members convened for dance class at the Club. Barbara testified that when she arrived for class, she noticed that Patricia was "pale," so she asked her what was wrong. Patricia said that Virginia had come to her house that morning and was "ranting and raving and screaming and throwing a fit looking for James." Barbara said that Patricia's exact words were "Virginia has got me freaked out."
Virginia arrived at the Club at approximately 7:00 p.m. Phyllis got to the Club about ten minutes later and noticed that Virginia was "staring a hole through" Patricia, so she suggested to Virginia that they leave and go play bingo. Virginia rode with Phyllis to the bingo parlor, and after they played one session, Phyllis took Virginia home.
Later that night, Virginia returned to the Club with a red shirt that belonged to James. Testimony at trial revealed that Virginia confronted Patricia, threw the shirt at her, and said, "[Y]ou give it to him, you'll see him before I will." Patricia told Club members that she feared Virginia would be waiting for her when she got home. Reese testified that Patricia said she "hoped Virginia didn't come up on her porch again in the morning like she did that morning."
B. The Day of the Murder, Tuesday, December 3, 2013
Phone records indicate that on Tuesday, December 3, at 7:57 a.m., an outgoing call from Patricia's phone was made to her friend Ken Caldwell. The call lasted one minute and fifty-two seconds.[3] Shortly thereafter, at around 8:00 a.m., neighbors heard five or six gunshots coming from the direction of Patricia's house. At 8:55 a.m., Barbara sent Patricia a message, stating, "Did she show up on your porch again today?" Patricia did not respond.
Phyllis testified that Virginia came to her house at around 10:00 a.m. that morning. Phyllis said that she "chewed [Virginia] out" for returning to the Club the night before and told her that she had to stop harassing Patricia. Phyllis said that Virginia told her, "You and [Patricia] are my only friends." Phyllis responded, "[W]hat are you talking about ... you have been accusing her of being with your husband for four days and now you want *677 to tell me she's your friend ... I said that ain't going to get it. I said and if you don't quit going out there harassing her, I knew you was on that porch, she'd never said a word to me the morning before." A few minutes later, Phyllis noticed that Virginia was smiling. Phyllis said that Virginia "hadn't smiled in four days" and hadn't "quit whimpering in four days, where's my James, where's my James." That day, however, Virginia did not mention his name. Phyllis said that she did not know what had happened but she knew "something was different" because Virginia was "grinning from ear to ear." At 10:06 a.m., Phyllis texted Patricia, "Just text if u r ok virginia is very unstable n I am worried."
After Patricia failed to return missed phone calls and text messages for the rest of the day, Barbara and Phyllis went to check on Patricia at her house. Around 5:30 p.m., Barbara found Patricia-she had been shot to death on the porch of her home. Deputy Chief Medical Examiner Stephen Erickson testified that Patricia had died of multiple gunshot wounds and that the manner of death was homicide. Specifically, Dr. Erickson testified that an examination of Patricia's body revealed five gunshot wounds. One wound was located on the right chest, just below the clavicle. Erickson stated that this wound struck both lung lobes and would have been fatal in and of itself. A second wound was discovered on the right breast. This wound also went through both lung lobes and would have been fatal in and of itself. A third wound was discovered in the fold of Patricia's armpit. Erickson stated that this wound struck the lungs, "devastated the heart," and would have been "rapidly fatal." He stated that the three wounds"produce[d] an almost immediate loss of blood pressure throughout the body." Patricia would have collapsed in about fifteen to twenty seconds. Two other wounds were found-one on the upper back and one on the right forearm. Erickson testified that neither wound would have been independently fatal. He further testified that stippling[4] on Patricia's lips, chin, and nose indicated that at least one of the shots was fired from as close as three feet.
C. After the Murder
After responding to the crime scene and gathering information, officers from the Texarkana Police Department went to Virginia's home around 2:00 a.m. on December 4. Detective Paul Nall called Virginia and asked her to surrender herself outside. After several minutes, she walked outside and was placed under arrest. When officers entered the house to collect evidence, they discovered that Virginia had placed chairs under all the door knobs.
Detective Jason Haak testified that, during interrogation later that day, Virginia's demeanor was "laid back" and "nonchalant" and that she did not appear to be scared or nervous. Virginia was neither tearful nor upset upon learning that Patricia had been murdered. Haak said Virginia told him that Patricia had probably been in an accident because she was a horrible driver. Virginia initially denied owning a .38-caliber revolver; however, when she was confronted with information that James had asked about the gun, she stated that they might have lost it when they moved a few months earlier. Virginia first claimed that she had not fired a gun in 25 to 30 years, but she later said that she had not fired a gun in 8 to 10 years.
*678 Virginia told the detectives that James had left her and that James and Patricia had been having an affair. She thought the affair had been going on for two or three years and she said that James had been to Patricia's house "two hundred and nineteen days in a row." At first, Virginia denied having problems with Patricia and going to her house on December 2. But Haak said that Virginia changed her story when officers confronted her with a statement from James that he had called Virginia at Patricia's house that day and told her to leave. Virginia then admitted that she had been to Patricia's house around 8:00 a.m. on December 2. She said that she went there looking for James and that when she got there, she saw Patricia sitting on the front porch. Haak stated that Virginia told him she spoke with Patricia but denied that their meeting was confrontational.
When asked if she had gone back to Patricia's house at around 8:00 a.m. on December 3, Virginia said that it was too foggy to drive that morning. But she then changed her story and said that she had driven that morning. She told Haak that she went to McDonald's around 8:00 a.m. to get a sausage biscuit for her mother and then went to her mother's nursing home, where she stayed for about an hour, before she went to Phyllis's house to watch "The Price is Right." Testimony at trial revealed that video surveillance obtained from McDonald's indicates that Virginia, while driving her white Lincoln, did not stop to get food until approximately 9:30 a.m. Video surveillance obtained from the nursing home shows that Virginia entered the nursing home, carrying a sack, at 9:42 a.m. and left at 9:54 a.m.
Detectives also obtained video footage from the E-Z Mart located about three miles from Patricia's house. Detective Nall testified that video shows a vehicle matching Virginia's car heading in the direction of Patricia's house at 7:53:42 a.m. He testified that a similar vehicle was captured by video footage at 8:16:18 a.m. traveling in the opposite direction.[5]
After Virginia was arrested, officers conducted a search of her home. Several items of clothing, including a shirt that tested positive for gunshot residue, were lying on Virginia's bed. Nall testified that some of the clothing that was collected matched the clothing that Virginia was seen wearing in the McDonald's video and the nursing-home video. Officers also found .38-caliber ammunition at Virginia's home but did not find a .38-caliber revolver.
II. Law & Analysis
Virginia contends that the State failed to offer sufficient proof that she killed Patricia or that she acted with premeditation and deliberation. In support of her contention, she states that no eyewitness testimony placed her at the crime scene and that no physical evidence linked her to the crime. The test for determining sufficiency of the evidence is whether substantial evidence, direct or circumstantial, supports the verdict. See Reinert v. State , 348 Ark. 1, 71 S.W.3d 52 (2002). Direct evidence is evidence that proves a fact without resort to inference; for example, when it is proved by witnesses who testify to what they saw, heard, or experienced. Jackson v. State , 363 Ark. 311, 214 S.W.3d 232 (2005). Circumstantial evidence is evidence of circumstances from which a fact may be inferred. Chatmon v. State , 2015 Ark. 28, 467 S.W.3d 731.
Virginia's principal argument is that the State's proof, which was entirely *679 circumstantial, was insufficient to support a verdict of guilty. We have emphasized that although the jury should be instructed, as it was here, that circumstantial evidence must be consistent with the guilt of the defendant and inconsistent with any other reasonable conclusion, that is not the standard by which we review the evidence. Cassell v. State , 273 Ark. 59, 62, 616 S.W.2d 485, 487 (1981). Our responsibility is to determine whether the verdict is supported by substantial evidence, which means whether the jury could have reached its conclusion without having to resort to speculation or conjecture. MacKool v. State , 365 Ark. 416, 231 S.W.3d 676 (2006). Guilt may be established without eyewitness testimony, and evidence of guilt is not less substantial because it is circumstantial. See, e.g. , Gregory v. State , 341 Ark. 243, 15 S.W.3d 690 (2000).
A person commits the offense of capital murder if "[w]ith the premeditated and deliberated purpose of causing the death of another person, the person causes the death of any person." Ark. Code Ann. § 5-10-101(a)(4) (Repl. 2013). Premeditation means to think of beforehand, and deliberation means weighing in the mind of the consequences of a course of conduct, as distinguished from acting upon a sudden impulse without the exercise of reasoning powers. O'Neal v. State , 356 Ark. 674, 158 S.W.3d 175 (2004). Premeditation and deliberation in the act of murder do not have to exist in the assailant's mind for an appreciable length of time but must exist when the assailant commits the act. See Cox v. State , 305 Ark. 244, 808 S.W.2d 306 (1991) ; Westbrook v. State , 265 Ark. 736, 747, 580 S.W.2d 702, 708 (1979) (stating that premeditation and deliberation may occur "almost on the spur of the moment"); Shipman v. State , 252 Ark. 285, 287, 478 S.W.2d 421, 422 (1972) (noting that premeditation and deliberation "can be formulated in the assailant's mind upon an instant"). A jury can infer premeditation and deliberation from circumstantial evidence, such as the type and character of the weapon used; the nature, extent, and location of wounds inflicted; and the conduct of the accused. Stephenson v. State , 373 Ark. 134, 282 S.W.3d 772 (2008).
The following evidence supported the State's theory that Virginia committed the murder. Patricia was having an affair with Virginia's husband, James. James had left Virginia four days before the murder because he feared for his life. Testimony at trial revealed that Virginia "hated" Patricia and blamed Patricia for the separation. After James left her, Virginia confronted and harassed Patricia on the phone, at Patricia's home, and at the Club. Patricia was shot five times with .38-caliber bullets, and Virginia owned a .38-caliber five-shot revolver. Police found .38-caliber bullets in Virginia's home. A shirt found on Virginia's bed tested positive for gunshot residue. Video surveillance and still photos showed a car matching Virginia's car driving toward Patricia's house about seven minutes before the murder and away from Patricia's house about fifteen minutes after the murder.[6] Virginia's statement to police *680 concerning her whereabouts on the morning of the murder was contradicted by the video evidence from McDonald's and the nursing home. Phyllis noticed a drastic change in Virginia's demeanor two hours after the murder. Virginia was no longer crying and distraught; rather, she was "grinning from ear to ear."
Moreover, Virginia's actions and statements after the shooting showed a consciousness of guilt that supported the State's case. After Virginia was arrested, she made inconsistent statements about her possession and use of a .38-caliber gun. She made a false statement to detectives about going to Patricia's house the day before the murder. But when confronted with evidence to the contrary, Virginia admitted that she had gone to Patricia's house and talked with her around 8:00 a.m. the day before Patricia was killed. This court has held that a defendant's false and inconsistent statements may be considered by the jury as circumstances tending to establish his or her guilt. See, e.g. , Martin v. State , 346 Ark. 198, 57 S.W.3d 136 (2001) (noting that the jury is not required to set aside its common sense in evaluating the ordinary affairs of life and that it may infer a defendant's guilt from improbable explanations of incriminating conduct); Hill v. State , 299 Ark. 327, 773 S.W.2d 424 (1989) (recognizing that false, improbable, and contradictory statements to explain suspicious circumstances may be considered by the jury in determining guilt); Botany v. State , 258 Ark. 866, 529 S.W.2d 149 (1975) (stating that, generally, the acts and conduct of an accused at the time of his arrest are admissible to show a consciousness of guilt). We conclude that substantial evidence supports the jury's finding that Virginia murdered Patricia.[7]
We further conclude that substantial evidence supports the jury's determination that Virginia acted with premeditation and deliberation. Specifically, it was possible for the jury to find that Virginia-who had four days to cool off after her husband left her-acted with premeditation and deliberation when, armed with a gun, she intentionally drove to Patricia's house and shot her five times. Based on the testimony and evidence offered at trial, we hold that there was substantial evidence to support the jury's verdict that Virginia committed capital murder. The circuit court did not err in denying Virginia's motion for directed verdict. Accordingly, we affirm.
III. 4-3(i) Review
In the instant case, Virginia received a sentence of life imprisonment. Pursuant to Arkansas Supreme Court Rule 4-3(i) (2017), we are required to review the record for all objections, motions, and requests that were decided adversely to Virginia. We acknowledge that our review includes the circuit court's ruling on the admission of the body-submission form.[8] No reversible error has been found in our review.
Affirmed.
Baker and Hart, JJ., dissent.

For clarity, we refer to the appellant, the victim, and some witnesses by their first names.

Ray died in 2012.

Detective Tye Whatley of the Texarkana Police Department testified about Patricia's cell phone records. He stated that these records showed that no outgoing phone calls were made from Patricia's phone after the 7:57 a.m. call to Ken Caldwell. The phone records also showed that Caldwell called Patricia at 8:10 a.m., but she did not answer. Other calls to Patricia's phone went unanswered. The cell phone records were admitted at trial without objection.

Stippling "consists of multiple reddish to reddish-brown punctate abrasions of the skin due to the impact of small fragments of foreign material." Vincent J.M. Di Maio, Gunshot Wounds : Practical Aspects of Firearms, Ballistics, and Forensic Techniques 91 (3d ed. 2016).

The E-Z Mart videos were shown to the jury, and still photographs of the videos were admitted into evidence.

Nall testified that he was unable to identify the driver shown in the videos and still photos. Accordingly, Virginia contends that the evidence does not connect her to the crime. Alternatively, she suggests that the videos and still photos captured Barbara's car driving by the E-Z Mart. At trial, Barbara testified that she drove a car that was identical to Virginia's car. When asked where she was around 8:00 a.m. on the day of the murder, Barbara said that she was taking her granddaughter to school. In sum, Virginia appears to assert that when we conduct our review, we must disregard the videos and still photos because they lack evidentiary value. We disagree. It is the function of the jury, not this court, to evaluate the credibility of witnesses and to apportion the weight to be given to the evidence. E.g. , Bell v. State , 334 Ark. 285, 973 S.W.2d 806 (1998).

We note Virginia's contention that the testimony of several witnesses is suspect because they were beneficiaries of Patricia's life-insurance policies. She reasons that the witnesses "had a motive to see [her] convicted" because "they would benefit financially" from Patricia's death. The credibility of witnesses and the weight which should be given their testimony is exclusively for the jury's determination, and not for this court on appeal. See Bell , 334 Ark. 285, 973 S.W.2d 806.

Virginia does not challenge the circuit court's ruling in her brief on appeal.