Gerald Dean FOWLER *v.* STATE of Arkansas

CR 99-802                                             5 S.W. 3d 10

Supreme Court of Arkansas
Opinion delivered November 18, 1999

*Benton D. Bryant*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Gil Dudley*, Asst. Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice. ■ This case is before us on review from the Arkansas Court of Appeals.[1] Mr. Gerald Fowler appealed his conviction of harassment in Washington County Circuit Court. He argued that the trial court erred in permitting the State to cross-examine him and another witness about their attendance at a meeting and about certain beliefs they shared concerning the authority of the Washington County Circuit Court over them. The Court of Appeals agreed with Mr. Fowler and reversed. We granted the State's petition for review. It is well settled that upon a petition for review, we consider the case as though it were originally filed in this court. *Frette v. City of Springdale*, 331 Ark. 103, 959 S.W.2d 734 (1998); *Travis v. State*, 331 Ark. 7, 959 S.W.2d 32 (1998).

The victim, Helen Wright, worked as a receptionist at the Jones Center in Washington County, Arkansas. She became acquainted with Mr. Fowler as a result of his regular visits to the Jones Center to attend meetings of a community-improvement group. Mrs. Wright testified that Mr. Fowler became very demanding of her during his visits to the center. Specifically, she testified that Mr. Fowler began talking to her on a daily basis about religion and that his unprovoked discussions with her interfered with the performance of her job. In September of 1997, she reported Mr. Fowler to security at the center, at which time two security officers spoke to him about his behavior.

On September 13, 1997, Mr. Fowler telephoned Mrs. Wright at her home and asked her to write down his name and phone number. She reported that incident to security officers at the Jones Center. The following week, Mr. Fowler telephoned Mrs. Wright at the Jones Center. After she informed a security officer about the call, .he picked up the phone and told Mr. Fowler to leave Mrs. Wright alone. Five minutes later, Mr. Fowler arrived at the Jones

---

[1] *Reporter's note: See Fowler v. State*, 67 Ark. App. 114, 992 S.W.2d 804 (1999).

Center and approached Mrs. Wright. At that point, she called the police. When they arrived, they spoke with Mr. Fowler and directed him not to harass Mrs. Wright. As a result of this incident, the Municipal Judge for the City of Springdale issued an order on October 7, 1997, that prohibited Mr. Fowler from approaching or communicating with Mrs. Wright or her family.

The charge of harassment that forms the basis of this appeal arises out of an incident that is alleged to have occurred on October 9, 1997. According to the testimony of Mrs. Wright and her daughter, they left the Jones Center at about 10:00 p.m. that day. During their drive home, they stopped at a red light at the intersection of Mountain Road and Highway 265. Mr. Fowler pulled up beside them in a minivan and made eye contact with Mrs. Wright and her daughter. After the red light turned green, Mr. Fowler proceeded to follow Mrs. Wright and her daughter for several miles. Mrs. Wright testified that the minivan driven by Mr. Fowler followed her after she turned left onto Randall Wobbe Road. She then turned right onto Lowell Road and turned around at the first business. After she pulled back onto Lowell Road and headed south, she again saw Mr. Fowler as he traveled north on Lowell Road. She then turned back onto Randall Wobbe Road and traveled west toward Highway 71. After making a right turn onto Highway 71, she drove north for a distance of about two miles. At the intersection of Highway 71 and Apple Blossom Road, Mrs. Wright turned right onto Apple Blossom Road, and again turned around at the first business. She then drove back to the intersection of Apple Blossom Road and Highway 71. As she was preparing to turn and go back south on Highway 71, she again saw Mr. Fowler driving the minivan north on Highway 71.

This testimony by Ms. Wright and her daughter was controverted by several witnesses for the defense. Mr. Fowler testified that he attended a meeting at the Jones Center on October 9, 1997, left the center at approximately 9:45 p.m., and then arrived at a local pizza restaurant at about 10:10 p.m. or 10:15 p.m. His testimony was corroborated by three witnesses who attended the meeting that evening and also met him at the pizza restaurant. According to Mr. Fowler and his roommate, Mr. Fowler was at their home between the time he left the Jones Center and the time he arrived at the restaurant, that is, between 9:45 p.m. and 10:10 p.m. or 10:15 p.m. On cross-examination by the State, Mr. Fowler and one of his alibi

witnesses, Mr. Nick Herrington, were asked about the meetings they attended at the Jones Center and the beliefs they shared concerning the court's authority over them. The trial court ruled that these inquiries by the State were relevant to the issue of each witness's credibility. At the conclusion of the trial, the jury found Mr. Fowler guilty of the crime of harassment and imposed a sentence of one year in the Washington County Jail and a fine of $1000.

Mr. Fowler asserts on appeal that the trial court erred when it allowed the State to question him and Mr. Herrington about their political beliefs. A defendant's political beliefs are ordinarily irrelevant in a criminal prosecution. However, the particular question presented in this appeal is whether the beliefs that this defendant and his alibi witness shared about the Washington County Circuit Court's authority over them were relevant to the issue of their credibility.

█ The admission of evidence is a matter that lies within the discretion of the trial court. *Arthur v. Zearley*, 337 Ark. 125, 992 S.W.2d 67 (1999); *Bell v. State*, 334 Ark. 285, 973 S.W.2d 806 (1998). In order to determine whether the trial court abused its discretion in permitting the challenged inquiry by the State, we first examine the relevant portions of Mr. Fowler's and Mr. Herrington's cross-examination by the State. After Mr. Fowler's testimony on direct examination, the State cross-examined:

> Q Let me ask you, do your meetings, do you have discussions or talk about or deal with government matters at your meetings?
>
> A No.
>
> MR. BRYANT: Objection, irrelevant, beyond the scope of direct examination.
>
> MR. FRANCO: I think if I'm allowed to flush this out I'll try to be as absolutely brief as possible but I think that I can get to a point that will deal directly with his credibility.
>
> THE COURT: Well, I think if this goes to credibility then I'll permit it for at least the time being. Overruled.
>
> CONTINUING CROSS-EXAMINATION BY MR. FRANCO:
>
> Q Do you deal with matters relating to the government?

A No, sir, we deal with matters relating to constitutional documents.

Q Okay, do these, do you have discussions regarding the authority that governments or more specifically courts have over you?

A No, sir, we discuss citizen's rights.

Q All right. In the realm of dealing with the court system, more specifically the criminal justice system?

A Well, it's mainly the exercise of your rights, citizen's rights.

Q What are those citizen's rights?

A Well, that would be too much to enumerate.

Q Please answer the question?

MR. BRYANT: Your Honor, it's beyond me how this can have anything to do with the credibility of a witness.

The Court: Well, again, Counsel, I have addressed the objection. I'm going to permit it up to a point so overruled. Now, you may proceed.

CONTINUING CROSS-EXAMINATION BY MR. FRANCO:

Q What are those citizen's rights which you deal with — I'll narrow it for you, dealing just with the criminal justice system and the court system?

A Well, we don't confine it to that.

Q I want — let's just confine the topic to that for purposes of your answering the question?

A Well, it's — you know and I don't know if I can quote it exactly, one of your founding fathers said, vigilance, and I can't quote it exactly but vigilance is the exercise of freedom to keep a nation's citizens free so it's to make people aware of what the constitution is for and how that it is to work as a restraint against governmental abuses.

Q What governmental abuses?

A Well, I don't know, I feel strange you'd ask me that question as if you don't think there's ever been any governmental abuses.

Q Do you feel that you've ever been abused by the government yourself?

A I feel like that there has been an excess of it by the government, that and of course they're discussing this every day in the newspapers and this is what the courts are for is to try to work out the differences of people's opinions as to what is correctly judicial and what is not.

Q That flag right there has gold stripes on it; is that correct?

MR. BRYANT: Objection, Your Honor, may I approach please?

THE COURT: You may.

MR. BRYANT: Your Honor, the only thing the Prosecutor is trying to do in this case is prejudice the Jury against my client because of his political beliefs. There's no way this has anything to do with the ability to tell the truth or not. This is an outrageous attempt on the Prosecutor's part to prejudice my client and I'd ask that he not be permitted to do that.

MR. FRANCO: Throughout the entire prosecution of this matter Mr. Fowler has objected to the flag with gold stripes on it and stated it's military and doesn't have the authority over him, it's my understanding from his statement. I think if that's the belief here today I think it goes to, directly to the fact of if he thinks they have authority.

THE COURT: Well, you can narrow your question down to that particular issue which goes to credibility. I'm going to permit it but we need to narrow the scope of the inquiry and get on with it. All right. You may proceed.

BY MR. FRANCO:

Q What's the significance of the gold stripes on that flag right there?

A It shows that it's a military flag.

Q In your opinion, and?

A According to the studies that we have had, that's correct.

Q All right. What's that mean in your opinion if it's a military flag?

A Well, if — now under, I'm quoting from the studies, all right.

Q Yes, sir, yes, sir?

A U.S.C. § 1, I believe 4D, denotes the U.S. constitutional flag of America.

Q What type of flag is that supposed to be, what's the gold mean?

A It does not have a symbol on top.

Q The gold fringe means it's a military flag; is that correct?

A Yes, sir, according to army regulations, according to certain codes.

Q Is it your belief that if it's a military flag then there — isn't it true that you're —it's your belief that since we have military flag in the courtroom this is basically a military court and we don't have jurisdiction over you in this court, is that your belief?

A I understand that Reed versus Calvert says no U.S. citizen shall be tried in a military court.

Q Yes, sir?

A And President George Bush, and I don't remember the date right now, signed an executive order that all courts in the United States are military courts.

Q He did?

A He did.

Q Do you consider this to be a military court?

A I'm just telling you what the record is.

Q I'm asking do you consider this to be a military court?

A I don't know as I have an opinion. I'm telling you that's what I have read by executive order of a U.S. Supreme Court ruling.

Q One more question on this topic. Based upon your studies and the fact that's a military flag, you're not in the military; correct?

A Not now.

Q Do you feel that you are in the wrong court here today to be tried for the charges that have been brought against you?

A I'm here.

Q Do you feel by — based upon your belief and your study that —

A Let me ask — may I ask you a question?

THE COURT: Now wait a minute, wait a minute. This process is not going to work at all unless we follow some basic rules. Mr. Franco, you ask the questions and you respond to the questions if possible with either a yes or no and if you don't understand the question simply tell him and he will restate the question and maybe sometime before sunset this matter will come an end. Please try again to repeat the question and you just answer, you ask the question and you respond as briefly and succinctly as you possibly can hopefully with a yes or no and then we'll move ahead.

BY MR. FRANCO:

Q Based upon your study and your understanding of this executive order, do you feel that you are in the proper court yourself for the charges that have been filed against you?

A To the best of my study until I'm shown differently or can be proved differently I'm a U.S. citizen in one of the fifty states, I'm under the U.S. Constitution of America as a free citizen, I'm not in the military and if it's correct according to the study that's a military flag, that flag denotes what court I'm under in this room.

Q So you, based upon your study you believe this to be a military court?

A According to George Bush.

Then, on redirect by Mr. Bryant:

Q Gerald, are you nervous about being here today?

A I'm totally relaxed.

Q Even though you may have a disagreement about whether or not that particular flag is the proper flag to be displayed in a courtroom, do you fully accept — I mean what's your thoughts about this Court's jurisdiction over you, do you accept that?

A Yeah, I have accepted it.

Q And what are your thoughts about the role of the Jury here today?

A I think that's a great American way.

Later in the trial, Mr. Nick Herrington was cross-examined by the State:

Q Your meetings out there, what type meeting is that?

MR. BRYANT: Object, Your Honor, beyond the scope of direct examination.

MR. FRANCO: He said he was at the meeting. I think he opened the door.

THE COURT: Well, I really fail to see how it's relevant to these proceedings, Counsel. If you can tie it into something, I'll permit a few questions.

MR. FRANCO: It's just like when we did Mr. Fowler, I'll get right to the point.

BY MR. FRANCO:

Q You notice the flag over there?

A Yes, sir.

Q What sticks out on that flag to you?

A A variety of things.

Q What about the gold fringe around the flag?

A Indicates military law.

Q What does that mean to you?

A It's not common law.

Q Okay, it's not common law?

A No, sir it's not.

Q The law that we're doing in court here today, the trial we have is a criminal trial?

A Yes, sir.

Q What type of law is this we're doing here today?

A That flag indicates military law.

Q In your opinion is this a military court?

A Not my opinion.

Q Whose opinion?

A Title 4, U.S. Code, Section 102, which defines the flag, Title 36, U.S. Code 71-73, which goes further into the flag, Army Regulation 840-10, that really gets into it, Chapter 8.

Q Do you believe that Mr. Fowler is in the right court today for the charges for, he's been charged with, a violation of state law—

MR. BRYANT: Your Honor, this is all very interesting.

THE COURT: Overruled, it goes to credibility. I'm going to permit it. Overruled.

BY MR. FRANCO:

Q You believe Mr. Fowler is in the correct court today based upon the flag that's here and he's charged with a crime under the laws of the State of Arkansas?

A How you define a crime—

Q The crime of harassment, he's charged with the crime of harassment?

A Well—

Q It's a yes or no question, do you believe he's in the right court?

A I don't know.

Q Do you — you're here as a witness in this court today and I think you took an oath, you were sworn in; is that correct?

A Yes, sir.

Q Does the fact that you're under that flag, you don't — let me back up just a second, you believe that that's the wrong flag to be in this courtroom, correct?

A We don't have a complete set of flags here, let's put it that way.

Q What other flag is missing then if that flag is flying?

A The American flag of peace means Old Glory is present, do you see it?

Q So we have the right flag?

A You don't have a complete set.

Q Based upon that do you believe that you're bound by the authority of this court here today?

A I'm a witness here.

Q Well, do you believe based upon your belief that Mr. Fowler is bound by the authority of this court?

A Yes, he's got an attorney.

Q No, let me restate my question. Do you believe that Mr. Fowler is bound by the authority of this court, that he comes under the authority of this court based upon what you have talked about, the flag and stuff—

MR. BRYANT: Your Honor, how is the witness supposed to testify as to what Mr. Fowler believes? I believe that's improper.

THE COURT: That wasn't the question. The question was does this witness believe that Mr. Fowler is bound by the authority of this court, which I assume goes to his belief in this system which to some extent has something to do with his credibility. I think if he can narrow the issue to one of credibility I'm going to permit the inquiry and please, let's move along.

MR. FRANCO: That's the last question I have, Your Honor, and that's exactly what I'm asking about.

BY MR. FRANCO:

A If he didn't believe he was bound he wouldn't be here.

Then, on redirect by MR. BRYANT:

> Q Mr. Herrington, understand what it means to take an oath to tell the truth?
>
> A Yes, sir.
>
> Q Are you bound by that oath here today?
>
> A Yes, sir.

■ On appeal, Mr. Fowler argues that Rule 608(b) of the Arkansas Rules of Evidence governs the admissibility of the challenged testimony. This argument misses the mark. Rule 608(b) pertains to the impeachment of a witness's credibility by proving specific instances of conduct. Here, there was no attempt by the State to impeach either witness's credibility by proving specific instances of conduct. Rather, the State sought to establish that Mr. Fowler and Mr. Herrington did not believe the Washington County Circuit Court had authority to try the case and thus cast doubt on their obligation to tell the truth under oath. Rule 608(b) is simply not applicable. The United States Supreme Court rejected a similar argument in *United States v. Abel*, 469 U.S. 45 (1984), and recognized that impeachment by conduct under Rule 608(b) is a separate matter from impeachment by proof of bias.

■ As a general rule, all relevant evidence is admissible. Ark. R. Evid. 402. Relevant evidence is any evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Ark. R. Evid. 401. A witness's credibility is always an issue, subject to attack by any party. *Dansby v. State*, 338 Ark. 697, 1 S.W.3d 403 (1999); Ark. R. Evid. 607. The scope of cross-examination extends to matters of credibility. Ark. R. Evid. 611. A matter is not collateral if the evidence is relevant to show bias, knowledge, intent, or interest. *See Dansby v. State, supra; Arthur v. Zearley, supra; Pyle v. State*, 314 Ark. 165, 862 S.W.2d 833 (1993); *Goodwin v. State*, 263 Ark. 856, 568 S.W.2d 3 (1978). Proof of bias is "almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *United States v. Abel, supra*, at 52. In other words, matters affecting the credibility of a witness are always relevant.

In this case, Mr. Fowler testified at trial and denied harassing the victim. He also presented alibi witnesses in his defense. On the other hand, the victim and her daughter testified that they were harassed by Mr. Fowler. The credibility of Mr. Fowler and his alibi witnesses were crucial to the resolution of this case. The issue presented, then, is whether the State's line of questioning was relevant to the issue of their credibility. We conclude that, in this particular instance, it was.

■ The State successfully elicited from Mr. Fowler his view that the flag in the courtroom was a military flag; that *Reed v. Calvert* says that no United States citizen shall be tried in a military court; and that President Bush signed an executive order that all courts in the United States are military courts. From Mr. Herrington, the State elicited his view that the flag in the trial court was not "common law" but indicated military law; that the United States Code stated that the trial court was a military court; and that Mr. Herrington was uncertain that Mr. Fowler was in the right court. The jury could have concluded from this evidence that the witnesses questioned the authority of the court to hear the case, and that their commitment to tell the truth in a court whose authority they questioned might be doubtful. Thus, the evidence elicited was circumstantial evidence bearing on the witnesses's credibility.

> The man who believes that he is under no legal or moral obligation at all times and under all circumstances to tell the truth under the sanction of an oath has destroyed the only test by which he can claim credit at the hands of men.

Wigmore, *Evidence* § 957 (Chadbourn Rev. 1970) (quoting from *Anonymous*, 19 S.C.L. (1 Hill) 251, 252 (1833)). The evidence of Mr. Fowler's and Mr. Herrington's beliefs concerning the Washington County Circuit Court's authority over them would have a tendency to make the facts to which they testified less probable in the eyes of the jury than they would be without the evidence. Hence, that evidence was relevant to the issue of their credibility.

■ The testimony at issue in this case was admitted during the State's cross-examination of Mr. Fowler and Mr. Herrington. This court has traditionally taken the view that the cross-examiner should be given wide latitude because cross-examination is the means by which to test the truth of the witness's testimony and the witness's credibility. *Wilson v. State*, 289 Ark. 141, 712 S.W.2d 654

(1986). Similarly in *Davis v. Alaska,* 415 U.S. 308 (1974), the United States Supreme Court reiterated that:

> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.... The cross-examiner is not only permitted to delve into the [witness's] story to test the [witness's] perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.

*Davis v. Alaska, supra.* We have stressed the importance of allowing wide latitude with regard to the admission of evidence relevant to the bias of a witness. *Jones v. State,* 336 Ark. 191, 984 S.W.2d 432 (1999). Also, the trial court is given wide discretion in evidentiary rulings, and we will not reverse unless the trial court has abused its discretion. *Jones v. State, supra.* Under these circumstances, we cannot say that the trial court's evidentiary ruling was an abuse of discretion.

■ The dissenting opinion relies on Ark. R. Evid. 403, which makes otherwise relevant evidence inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice. However, the Rule 403 weighing issue was not preserved for appeal because it was neither raised at trial by Mr. Fowler nor was it ruled upon by the trial court. While Mr. Fowler mentioned the word "prejudice," he never put the trial judge on notice that he was asking him to balance probative value against prejudice. Also, the trial court never specifically ruled on the prejudice objection. We have previously held that merely mentioning the word "prejudicial" without obtaining a ruling by the trial court results in a failure to preserve the Rule 403 issue for appeal. *Terry v. State,* 309 Ark. 64, 826 S.W.2d 817 (1992). Therefore, we are precluded from considering Rule 403. *Id.*; *Thomson v. Littlefield,* 319 Ark. 648, 893 S.W.2d 788 (1995). The dissenting opinion also argues that *Dawson v. Delaware,* 503 U.S. 159 (1992), is controlling because there "the Court, in essence, determined that the admission of the stipulation was more prejudicial than probative...." We note, however, that Mr. Dawson did not argue for a weighing of probative value versus prejudice. Additionally, the Supreme Court did not base its decision on the prejudicial effect of the evidence. Rather, the Court determined that the evidence had "no relevance to the sentencing proceedings in this case." *Id.* at 166. In contrast, the evidence in this particular case concerning Mr. Fowler's and Mr. Herrington's

beliefs about the Circuit Court's authority over them was relevant to the issue of their credibility.

Affirmed.

GLAZE, THORNTON, and SMITH, JJ., dissent.

LAVENSKI R. SMITH, Justice, dissenting. The majority holds that Fowler's political opinions are relevant evidence in his prosecution for harassment. The majority does so by stating that a witness's credibility is always an issue and by pointing out that proof of bias goes to credibility and is therefore admissible. The majority thus affirms the trial court's decision to permit the prosecution to enquire into the defendant's political beliefs in order to discredit his testimony that he did not follow the victim in his vehicle on October 9, 1997. In particular, the majority takes the position that Fowler's beliefs regarding United States flags and miliary courts called into question his respect for the authority of the court. Thus, if he might question the court's authority he might also not honor his oath as a witness to speak truthfully. The majority further holds that Fowler's objection to the questioning failed to raise an issue of prejudice under Ark. R. Evid. 403. I disagree.

Evidence of bias is clearly admissible and for good reason. However, there are limits. Bias evidence, just like any other relevant evidence, is subject to limitations under Ark. R. Evid. 403, should an objection be made. The majority holds that Fowler failed to make this objection. I believe Fowler preserved objections to the evidence both as to its ultimate relevance and as to its potential prejudice under Rule 403.

As the majority quoted above, during Fowler's cross-examination, Fowler's attorney in his third of six objections to the line of questioning, stated:

> MR. BRYANT: Objection, Your Honor, may I approach please?
>
> THE COURT: You may.
>
> MR. BRYANT: Your Honor, the only thing the Prosecutor is trying to do in this case is prejudice the Jury against my client because of his political beliefs. There's no way this has anything to do with the ability to tell the truth or not. This is an outrageous

attempt on the Prosecutor's part to prejudice my client and I'd ask that he not be permitted to do that.

THE COURT: Well, you can narrow your question down to that particular issue which goes to credibility. I'm going to permit it but we need to narrow the scope of the inquiry and get on with it. All right. You may proceed.

The court then allowed the prosecutor to proceed with the questioning on the basis of credibility, in effect denying the objection.

While Fowler's objection does not specifically cite Rule 403 as the basis for the objection, his objection clearly addresses "prejudice" as a ground for exclusion of the evidence. Specificity in making objections is important, but not always essential.

Because the purpose of a trial objection is to avoid error, an objection to a question should be specific enough to inform the trial court of the particular problem, so that the court can realize what rule of evidence is being invoked, and why that rule would exclude a responsive answer, and can then rule intelligently thereon, and so that the party offering the testimony is given an opportunity to confront the objection. ... But all that is required of any objection to evidence is that the objection be sufficiently clear and definite so that the court will understand the reason for the objection and so that the basis of the objection is apparent to the trial court. Thus, even if inartfully stated, the courts will allow an objection that apprises the trial court of the reason for the objection.

75 AM. JUR.2d *Trial* § 424 (1998). Accordingly, Fowler's objection on the grounds of "prejudice" sufficed to alert the trial court that although possibly relevant, the evidence the prosecutor was attempting to elicit regarding Fowler's political beliefs was substantially more prejudicial than probative. In addition, a specific ground for an objection need not be stated where the error is clear from the context. *See* Ark. R. Evid. 103; *Thomson v. Littlefield*, 319 Ark. 648, 893 S.W.2d 788 (1995). Because a sufficient objection was raised, we should review the prejudicial impact of the prosecutor's line of questioning in this case.

As the majority noted, the United States Supreme Court considered the admissibility of similar evidence for bias purposes in *Abel, supra*, and under a Rule 403 analysis in *Dawson v. Delaware*, 503 U.S. 159 (1992). While the Court found that evidence of the

tenets of the "Aryan Brotherhood" in *Abel* was properly developed, in *Dawson*, the Court found that it was reversible error to allow such information into evidence. The distinctions between *Abel* and *Dawson* are crucial. The instant case is much more similar to *Dawson* than to *Abel*.

In *Abel*, the defendant and two cohorts were indicted for bank robbery. At Abel's trial, the prosecution called a witness who had also been a member of this gang. One of Abel's witnesses, Mills, had testified that he had no knowledge of the gang or its tenets, and the prosecution then offered for rebuttal another gang member who testified that he, Abel, and Mills were all members of this gang. This witness testified that the gang had sworn to perjure themselves to protect one another. The Ninth Circuit Court of Appeals found that the testimony could not be offered to show that Mills was lying because he was a member of the gang. The United States Supreme Court reversed, holding that Abel's and Mills' membership in the gang was sufficiently probative of Mills' possible bias towards Abel to warrant its admission into evidence.

In the opinion, the Court discussed how bias applies to a witness' testimony for or against a defendant. Because of the "common law of evidence" concept under which this testimony came in, the Court applied Rule 403 regarding the probative value of the evidence versus its prejudicial effect to determine in part whether the evidence was admissible to the issue at hand. The Court determined that its probative value outweighed its prejudice because of the common bond and shared beliefs Mills and Abel had through the gang in which they were involved, and specifically because these beliefs included a willingness to perjure themselves. *Abel* is also important because of the discussion the Court gave to the common membership that Abel and the two other witnesses shared. The Court specifically noted that "a witness's and a party's common membership in an organization, even without proof that the witness or party has personally adopted its tenets, is certainly probative of bias." *Abel*, 469 U.S. at 52. However, the Court qualified this broad statement by stating:

> [T]he type of organization in which a witness and a party share membership may be relevant to show bias. If the organization is a loosely knit group having nothing to do with the subject matter of the litigation, the inference of bias arising from common member-

ship may be small or nonexistent. If the prosecutor had elicited that both respondent and Mills belonged to the Book of the Month Club, the jury probably would not have inferred bias even if the District Court had admitted the testimony. The attributes of the Aryan Brotherhood – a secret prison sect sworn to perjury and self-protection – bore directly not only on the fact of bias but also on the source and strength of Mills' bias. The tenets of this group showed that Mills had a powerful motive to slant his testimony towards respondent, or even commit perjury outright.

*Abel,* 469 U.S. at 54.

By contrast, in *Dawson,* the Court reversed a first-degree murder sentence in the sentencing stage of trial based on the admission of a stipulation that Dawson was involved with the Aryan Brotherhood. The stipulation apparently proved only the group's abstract beliefs without proving that the group had committed any unlawful conduct or violent acts. As such, the Court found that it was not relevant to help prove any aggravating circumstances, or to rebut any mitigating evidence because membership in the group, in and of itself, cannot be considered sinister. In *Dawson,* the Court, in essence, determined that the admission of the stipulation was more prejudicial than probative because the stipulation was not sufficient to prove any aggravating circumstances. There was no foundation for finding that membership in the Aryan Brotherhood in and of itself proved anything relevant. The Court stated:

> Delaware might have avoided this problem if it had presented evidence showing more than mere abstract beliefs on Dawson's part, but, on the present record, one is left with the feeling that the Aryan Brotherhood evidence was employed simply because the jury would find these beliefs morally reprehensible. Because Delaware failed to do more, we cannot find the evidence was properly admitted as relevant character evidence.

*Dawson,* 503 U.S. at 167. However, in *Abel,* the prosecution laid the foundation by offering its own witness who was a member of the group who testified regarding the tenets of the group, including that they would lie for one another. The Court allowed that testimony in order to show that Mills, Abel's witness, was possibly biased in Abel's favor.

In the instant case, there is no evidence that the group to which Fowler belonged espouses perjury in defense of other members before the courts. Nor is there any clear connection made between the witness's abstract belief regarding indicia of court authority and a propensity for dishonesty. In fact, the record reflects very little about the group in question called "Community Improvement". The prosecutor began with a general inquiry concerning the subject matter of the group's meetings. He progressed to inquire into Fowler's beliefs about constitutional documents, citizen's rights, governmental abuses, the U.S. flag and concluded with a query about whether Fowler believed he was in a military court. On redirect, Fowler acknowledged his submission to the court's jurisdiction and reaffirmed his obligation to speak truthfully. Certainly, Fowler and any alibi witness who testified that he was elsewhere during the commission of the offense was fair game for cross-examination. But, what little, if anything, the prosecution's questions may have proved of bias was outweighed by the prejudice of stigmatizing Fowler as one with uncommon political beliefs. Those who have views, whether political, religious, moral, or philosophical, not generally embraced by the majority should not find those views so easily used to their detriment in our courts. Mr. Fowler may well have committed the offense for which he was charged and if so should endure the appropriate consequences. However, evidence of his abstract beliefs, without more than shown in the instant case, should not have been admitted into evidence. I, therefore, respectfully dissent.

THORNTON, J., joins.

GLAZE, J., dissents separately.