Donald GHOSTON *v.* STATE of Arkansas

CA CR 03-32                                    141 S.W.3d 907

Court of Appeals of Arkansas
Division IV
Opinion delivered January 21, 2004

388

*John W. Cone*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Clayton K. Hodges*, Ass't Att'y Gen., for appellee.

TERRY CRABTREE, Judge. In a jury trial, Donald Ghoston was found guilty of first-degree murder, attempted first-degree murder, and committing a terroristic act for which he was sentenced to a total of fifty years in prison. For reversal, appellant contends that the trial court erred in refusing his instruction on self-defense, in refusing his instruction on manslaughter, and in refusing to allow cross-examination of a witness in order to show bias. We find merit in the third issue raised and reverse and remand for a new trial.

This case involves a shoot-out that occurred at around 3:00 a.m. on Sunday June 24, 2001, on West 24th Avenue in Pine Bluff. The shooting occurred between persons positioned in front of the residence of Jamaul Savage and the occupants of an El Camino truck. No one at the house was injured. However, the driver of the truck, James Scott, was killed, and his brother, Michael Scott, who was riding in the back of the truck, was injured. William Taylor was a passenger in the truck, and he received an injury to his thumb.

According to William Taylor, he had been riding around with Michael Scott that evening when a tan Crown Victoria had fired shots at their vehicle. He and Michael then drove to the home of James Scott and told him of that occurrence. James Scott left for a short time, and when he came back, he had a shotgun and an SKS rifle. The three got into the truck and drove around looking for the Crown Victoria. James Scott and Taylor had the shotgun in the cab of the truck, while Michael Scott was in the back armed with the SKS rifle. Taylor said that they were headed for Jamaul Savage's house looking for the Crown Victoria and that they drove past the house and saw people in the yard and then they went to his cousin's house for a brief time. He said that they drove past Savage's house again and that this was when the shooting erupted. He said that the shooting began before they reached the house while they were at the corner of 24th and Elm Streets and that no shots had been fired from the truck at that point. The truck was being fired upon on the driver's side, and he tried to pull James Scott out of the truck. Taylor saw Michael lying down in the bed of the truck with his eyes closed. Taylor said that he fired once toward the house with the shotgun and that he grabbed the SKS rifle and ran. He got rid of the rifle during his escape, but he later led the police to where it could be found. On cross-examination, he admitted that he had told the officers that "I guess a shooting was going down" and that he had also told the police that some of the shots could have come from the back of the truck.

Roy Thompson testified that he arrived at the Savage's house at around 2:30 a.m. and that he smoked marijuana with persons inside the house. He had seen that O.T. Watson was wearing surgical gloves so he went outside to see "what was happening." Appellant told him that the occupants of the El Camino truck had jumped Savage's brother the night before and said that "we're going to get them." Thompson said that appellant retrieved a gun and also gave one to O.T. Watson and said "we're

gonna wait on them." Thompson then saw the truck coming back down the street with its lights out, and he saw someone in the back of the truck. He related that shots were fired from the house before the truck got there. Thompson testified that appellant was on one knee firing at the truck and that appellant then ran toward the truck while firing the weapon. Thompson, appellant, and others went to Little Rock that night and stayed in a motel. He said that he had stayed with a woman at the motel. He went to the police station in Pine Bluff the next day and gave a statement. On cross-examination, Thompson said that there were so many gunshots that he couldn't tell "who had shot at what." He denied that he had participated in the shooting or that he was casting blame on the appellant to mask his own guilt.

Takeiya Hudson, Savage's girlfriend at the time, testified that she had driven by the house and had seen the police and an ambulance there. She and her friend continued driving and saw appellant at a gas station wearing no shirt. Appellant flagged them down and got in the car. Appellant told Hudson that "they came by to do a drive-by on them, but instead we got them." They drove to a friend's house where appellant washed his face and hands with bleach to get rid of gunpowder. Ms. Hudson said that she, appellant, Savage, Roy Thompson, "Ked" and "Mun" drove to Little Rock that night to stay in a motel. According to her, she was the only female on the trip. She said that, when they heard the next day that Michael Scott had survived, appellant stated that there was no way that Michael Scott could have lived because he had shot him in the face. She further testified that appellant had threatened her and her children in an effort to get her to change her story.

Kashanda Gurley testified that she and appellant had a child together and that appellant had called her on either the 23rd or 24th of June. In this conversation, appellant told her that he had hidden some guns in her shed, and he asked her to get rid of them. Instead, she called the police who retrieved a .22 rifle and a .380 pistol. She also said that appellant asked her to give an alibi for him.

In addition to the SKS rifle Taylor retrieved for the police, officers recovered another SKS rifle from the home of the Kresses who lived next door to the Savages. Officers found a large quantity of shell casings at the scene of the shooting. The shotgun fired by Taylor was found under James Scott's body. One shotgun shell casing was found, and ballistics showed that it was fired from the

shotgun. Nine millimeter shell casings were found, but no weapon was recovered that matched any of the shell casings. Thirty-two 7.62 millimeter shell casings were submitted for testing. Fifteen of the shell casings were fired from the rifle that was recovered from the El Camino. Seventeen were fired from the one obtained from the Kress's home. Ballistics did not match any of the shell casings recovered to the .22 rifle or .380 handgun turned over to the police by Ms. Gurley. Michael Scott's hands were tested for gunshot residue and the test came back positive.

Dr. John Cone testified for the defense. He said that Michael Scott had an entry wound at the front of the mouth and an exit wound on his neck behind the ear. He had surgery to repair a broken jaw. Another witness, Edward Smith, testified that he lived on 24th Avenue and that he had heard the gunshots. He said that shots were being fired from both angles, meaning from the vehicle, as well as the street. He said that he also saw a red-and-white truck come to the scene and fire on the truck. Steve Kress, who lived next door to the Savages, testified that he saw the truck drive by and that there was an armed man in the back wearing something covering his face. He saw the truck drive by the first time and then went inside because he thought a shooting was about to occur.

Appellant first argues that the trial court erred in refusing to give an instruction on self-defense. We find no error. One who asserts the defense of justification for a homicide must show not only that the person killed was using deadly force, but that he responded with only such force as was necessary and that he could not have avoided the killing. *Smith v. State*, 337 Ark. 239, 988 S.W.2d 492 (1999). Deadly force is justified as self-defense only if the use of such force cannot be avoided, as by retreating. *Heinze v. State*, 309 Ark. 162, 827 S.W.2d 658 (1992). Likewise, Arkansas Code Annotated section 5-2-607(a) (Repl. 1997) provides that a person may not use deadly force in self-defense if he knows that he can avoid the necessity of using that force with complete safety by retreating, unless that person is in his dwelling and was not the original aggressor. Although the applicable instruction, AMCI 2d 705, makes provision for the requirement of retreating, the instruction appellant proffered did not include it.

Under the facts of this case, it should have been included since appellant was not at his own home and was by all accounts standing outside when the shooting took place. Where a defendant has offered sufficient evidence to raise a question of fact concern-

ing a defense, the instruction must fully and fairly declare the law applicable to the defense. *Walton v. State,* 53 Ark. App. 18, 918 S.W.2d 192 (1996). An appellant may not complain of the refusal of the trial court to give an instruction that is only partially correct, as it is his duty to submit a wholly correct instruction. *Merritt v. State,* 82 Ark. App. 351, 107 S.W.3d 894 (2003). Since appellant's instruction did not contain a complete statement of the law, it was not error to refuse it.

■ Secondly, appellant contends that the trial court erred in refusing to give a lesser-included offense instruction on manslaughter that he recklessly caused Mr. Scott's death. The jury, however, was instructed on capital murder, first-degree murder, and second-degree murder, and the jury returned a verdict for first-degree murder. Appellant thus suffered no prejudice. When a lesser-included offense has been the subject of an instruction, and the jury convicts of the greater offense, any error resulting from the failure to give an instruction on still another lesser included offense is cured. This is known as the skip rule. *Cooper v. State,* 324 Ark. 135, 919 S.W.2d 205 (1996).

Appellant's final argument is that the trial court erred in restricting his cross-examination of witness Roy Thompson by not allowing him to question the witness about an incident where he threatened and beat up Loleita "Nicki" Morris. Appellant's proffer showed that Ms. Morris left the police station with Thompson after she had given a statement to the police about the shooting. Just after they left the police station, Thompson was seen by numerous persons dragging Ms. Morris out of a car and beating her, such that her shirt was torn off. Several of the witnesses came to Ms. Morris's aid, and she was rescued. Ms. Morris told the police that Thompson was upset with her because he believed that she had not provided him with an alibi for the shooting as he had instructed her to do. Although the police interviewed the witnesses and Ms. Morris and made a report, Mr. Thompson was not charged with any crime as a result of the incident. Appellant argued that the matter was relevant on the issue of bias, but the trial court did not allow him to pursue the subject.

■■ A trial court is accorded wide discretion in evidentiary rulings, and will not be reversed on such rulings absent a manifest abuse of discretion. *Pryor v. State,* 71 Ark. App. 87, 27 S.W.3d 440 (2000). As was observed by the court in *Fowler v. State,* 339 Ark. 207, 5 S.W.3d 10 (1999):

As a general rule, all relevant evidence is admissible. Relevant evidence is any evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. A witness's credibility is always an issue, subject to attack by any party. The scope of cross-examination extends to matters of credibility. A matter is not collateral if the evidence is relevant to show bias, knowledge, intent, or interest. Proof of bias is 'almost always relevant because the jury, as the finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness's testimony.' In other words, matters affecting the credibility of a witness are always relevant.

*Id.* at 219, 5 S.W.3d at 16-17 (citations omitted).

In this case, Roy Thompson was admittedly outside the home of Jamaul Savage when the shooting occurred. He denied firing a weapon and testified favorably for the State by implicating appellant and O.T. Watson as the ones who had shot at the truck. In the proffer, Thompson allegedly threatened and battered a woman in retaliation against her for not relaying the information he wanted her to impart to the police. Although the beating of this woman was quite brutal and witnessed by many persons, he was not charged with any offense.

■ We think these matters reflected upon the witness's interest, his motives in testifying, and his bias and that cross-examination on this subject should have been allowed. *See Henderson v State,* 322 Ark. 402, 910 S.W.2d 656 (1995) (evidence of witness tampering is evidence of bias and consciousness of guilt and is thus admissible); *Wood v. White,* 311 Ark. 168, 842 S.W.2d 24 (1992) (hostility of a witness against a party admissible to show bias); *Goodwin v. State,* 263 Ark. 856, 568 S.W.2d 3 (1978) (officer's threat to make sure that the defendant went to prison if he did not become an informant relevant to the issue of bias and thus admissible); *Morris v. State,* 21 Ark. App. 228, 731 S.W.2d 230 (1987) (defendant's attempt to have a witness change her testimony admissible under rule 404(b)); *Tubbs v. State,* 19 Ark. App. 306, 720 S.W.2d 331 (1986) (witness's offer of money to another witness to get the witness to change testimony admissible as evidence of bias); *Hackett v. State,* 2 Ark. App. 228, 619 S.W.2d 687 (1981) (threatening a witness in an effort to keep the witness from

testifying against the defendant admissible on the issue of bias). We thus hold that the trial court abused its discretion. Because Thompson was a vital witness for the State, since he was the only eyewitness who actually placed a weapon in appellant's hands, we cannot conclude that the trial court's error was harmless. Therefore, we reverse and remand for a new trial.

Reversed and remanded.

ROBBINS and VAUGHT, JJ., agree.