I. Factual Background
Cantrell's injuries resulted from a single-car rollover accident that occurred in an eastbound lane of Interstate 630 in Little Rock on December 27, 2006. A truck driver who witnessed the accident testified that he saw Cantrell attempt to merge into the middle lane from the left side of the highway. A car was already in the middle lane when Cantrell attempted to merge, causing her to abruptly steer her Tundra back into the left lane. Cantrell appeared to lose control as she did so, and the truck collided with the median barrier of the highway. Cantrell's truck started to roll when it hit the barrier, and according to the witness, Cantrell was ejected from the vehicle after the first roll.
Cantrell's expert in accident reconstruction, Bruce Enz, agreed that the Tundra's collision with the median barrier induced a "passenger-side-leading roll." The vehicle rolled twice, ejecting Cantrell in the latter part of the roll sequence. The front wheel of the Tundra fell off in the collision, and the vehicle's subsequent contact with the ground produced approximately "8 to 12 g's of force" at the Tundra's center of gravity. The gravitational forces were carried through the Tundra's suspension system and frame, eventually reaching the seat-belt restraint system. While Mr. Enz could not determine the amount of gravitational force absorbed by the restraint system, he opined, based on the bent appearance of the seat-belt stalk and the lack of damage to other interior structures in the passenger compartment, that Cantrell had been wearing her seat belt during the accident. Mr. Enz also opined that a circular breakage pattern on the windshield did not indicate that Cantrell failed to use her seat belt, as Toyota alleged.
*162 Cantrell offered her inertial-unlatching theory principally through the testimony of Stephen Syson, a former design engineer at General Motors. Mr. Syson testified that the driver's seat belt in Cantrell's Tundra had an end-release buckle that was manufactured by QSS, a Canadian company. The driver unlatches the buckle with a press of a button that is supported by plastic "Delrin" springs that are manufactured by DuPont. Mr. Syson testified that the Delrin spring was prone to sag or break with repeated use, and DuPont had long warned that the Delrin spring should not be used in any application that would subject it to continuous force. According to Mr. Syson, the button and supporting springs in the QSS buckle are subjected to continuous force even when the latch is not inserted in the buckle.
Mr. Syson also testified that Toyota failed to adequately test the buckle while the Tundra was in preproduction, and his own testing of the QSS buckle-including dropping it from a height of one meter-indicated that it would inertially unlatch when subjected to forces that were less than those present in the rollover of Cantrell's Tundra. According to Mr. Syson, the Tundra dropped more than a meter after losing its right front wheel, causing approximately 86 to 100 g's of vertical force to unlatch Cantrell's seat belt. Finally, Mr. Syson testified that his inspection of the seat belt and buckle from Cantrell's Tundra, as well as the interior of the passenger compartment, indicated that she regularly wore her seat belt and that she was wearing it when the accident occurred.
Cantrell also introduced the testimony of Dr. Joseph Burton, who testified that his inspection of the Tundra's windshield did not reveal any indication that Cantrell's head hit the windshield, as Toyota alleged. He also opined that various injuries that she suffered during the accident, including a crack in her breastbone and a hematoma on her left adrenal gland, were consistent with seat-belt use.
Toyota introduced the testimony of Dr. William Van Arsdell, who also conducted an inspection of Cantrell's Tundra and opined, from the absence of "load marks" on the seat belt, that Cantrell was not actually wearing her seat belt at the time of the accident. Dr. Van Arsdell also explained that the only function of the Delrin spring is to return the buckle's end-release button to its original position, and contrary to Dr. Syson's testimony, the springs are under load only when the button on the buckle is depressed. His inspection of the buckle from Cantrell's Toyota indicated that the spring was intact. The doctor also explained that the seat belt is unlikely to inertially unlatch during a rollover accident because the load resulting from the belt's restraint of the occupant makes it harder to release the belt, and he declared that the inertial-unlatching theory involving the end-release buckle is not generally accepted in mainstream science.
Toyota also introduced the testimony of Dr. Michael Carhart, who disagreed with Dr. Burton's assessment that the damage to the Tundra's windshield was not a "head strike" indicating that Cantrell was not wearing her seat belt. Using Dr. Burton's photographs of the windshield after the accident, Dr. Carhart testified that the pattern consisted of concentric, radial cracks with a pulverized-glass center that was indicative of a head strike. Dr. Carhart was unable to personally inspect the windshield in the same condition that Dr. Burton did, however, because he found it "in the rear of [the Tundra] folded and balled up" when he subsequently inspected the Tundra in 2010.
Finally, Toyota introduced the testimony of Motori Shibata, a safety engineer at Toyota. Like Dr. Van Arsdell, Mr. Shibata *163 explained that the function of the Delrin spring is simply to return the push button on the end-release buckle, and it does not have any function in keeping the seat belt latched. The components responsible for keeping the seat belt latched are made of steel. Mr. Shibata further testified that Toyota used several methods to thoroughly test the seat belt in the 2000 Tundra, including a series of voluntary rollover tests. Mr. Shibata explained that while the rollover tests had been filmed at the time Toyota conducted them, Toyota judged that it was unnecessary to keep the film because (1) none of the components failed, (2) Toyota's engineers could understand the results from the still photographs and the data, and (3) the federal government did not require the tests.
As indicated above, the jury ultimately found for Toyota, responding "No" to jury interrogatory No. 1, asking whether the jury found "from a preponderance of the evidence that the driver's seat-belt buckle in the 2000 Toyota Tundra manufactured, assembled, sold, or distributed by Toyota was in a defective condition that rendered it unreasonably dangerous." The circuit court entered the judgment on September 26, 2016.
II. Direct Appeal
A. AMI Civ. 106
At the close of the evidence, both parties proffered jury instructions according to AMI Civ. 106, allowing juries to draw adverse inferences from parties' intentional destruction or suppression of evidence (otherwise known as spoliation). Cantrell proffered the instruction based on Mr. Shibata's testimony that Toyota destroyed the video recordings of the rollover testing that it performed while the 2000 Tundra was in preproduction, arguing that good engineering practice and Toyota's alleged awareness of unrelated claims involving the QSS buckle required Toyota to retain the recordings. Toyota, on the other hand, proffered the instruction based on the deterioration of the windshield while it was in Cantrell's custody. According to Toyota, the windshield was material to the issue of whether Cantrell had been wearing her seat belt at the time of the accident, and Cantrell and her counsel failed to maintain it in a condition that allowed a meaningful inspection by Toyota's expert, Dr. Carhart.
The circuit court denied Cantrell's requested instruction, finding that there was no evidence that Toyota had destroyed the recordings with any knowledge of a pending or potential claim. The circuit court granted Toyota's request to instruct the jury according to AMI Civ. 106, however, rejecting Cantrell's argument that there was no evidence that she intentionally destroyed the windshield. The jury was instructed as follows:
If you find that a party intentionally destroyed, discarded or lost the 2000 Toyota Tundra or any component of the 2000 Toyota Tundra with knowledge that it may be material to a potential claim, you may draw the inference that an examination of it would have been unfavorable to that party's claim. When I use the term "material" I mean evidence that could be a substantial factor in evaluating the merit of a claim or defense in this case.
Cantrell now appeals both rulings. Because the circuit court abused its discretion when it granted Toyota's request for a spoliation instruction, we reverse the judgment and remand the case for a new trial.
This court will not reverse a circuit court's decision to give or reject an instruction unless the court abused its discretion.
*164 Bunn Builders, Inc. v. Womack , 2011 Ark. 231, at 5, 2011 WL 2062393. "An abuse of discretion occurs when the circuit court acts improvidently, or thoughtlessly, [or] without due consideration." Milner v. Luttrell , 2011 Ark. App. 297, at 3, 384 S.W.3d 1, 3. "[A] party is entitled to a jury instruction when it is a correct statement of the law and when there is some basis in the evidence to support giving the instruction." Bunn Builders,Inc. , 2011 Ark. 231, at 5. While the supreme court has not required circuit courts to make specific findings of bad faith on the part of spoliators before submitting spoliation instructions to juries, see id. at 11, it has nonetheless defined spoliation as "the intentional destruction of evidence," Id. at 7, and has required circuit courts to find some evidence of intentional conduct before instructing juries on spoliation of evidence. Id. at 11 ; see also Rodgers v. CWR Constr., Inc. , 343 Ark. 126, 133, 33 S.W.3d 506, 511 (2000) (holding that the circuit court did not abuse its discretion by declining to give the instruction when there was no indication that the evidence was intentionally lost or destroyed); see also Tomlin v. Wal-Mart Stores, Inc. , 81 Ark. App. 198, 209, 100 S.W.3d 57, 64 (2003) (same).
In this case, there was no evidence that Cantrell or her counsel gave an order to destroy the windshield or that she engaged in any intentional conduct that warranted the instruction. The evidence showed, at most, that the windshield fell away from the truck's frame-and that someone placed the windshield in the bed of the truck-while the truck was in Cantrell's custody. Because the circuit court did not make any finding of intentional conduct that supported giving the instruction, and there is no evidence of intent that would permit such a finding, the circuit court abused its discretion by granting Toyota's request to instruct the jury according to AMI Civ. 106. Accordingly, we reverse and remand for a new trial.
Additionally, because the issue is likely to occur on retrial, we further hold that the circuit court did not err by refusing Cantrell's proffered instruction. While there is no dispute that Toyota intentionally ordered the destruction of the video recordings of the rollover tests, there was no evidence that there was any pending litigation or potential claims involving the Tundra's QSS buckle at the time that Toyota destroyed the recordings or that the destruction of the videos was anything outside of Toyota's routine practice. See Tomlin , 81 Ark. App. at 209, 100 S.W.3d at 64. Therefore, the circuit court properly refused to instruct the jury to consider whether Toyota spoliated evidence.
B. Additional Issues Likely to Occur on Retrial
Cantrell raises several additional issues that are likely to occur on retrial, including that the circuit court abused its discretion when it denied her motion for a mistrial after Toyota's counsel made a reference to her insurance company during his opening statement to the jury. Cantrell also challenges several of the circuit court's evidentiary rulings, including the court's decision to allow Corporal Cleary Chapman, the police officer who investigated the accident, to state his opinion that Cantrell was not wearing her seat belt. She also argues that the circuit court erred by excluding extrinsic evidence demonstrating the bias and dishonesty of defense witness Lucy Claeys and by curtailing her attempts to establish Mr. Syson's and Mr. Burton's expert qualifications. Finally, Cantrell argues that the circuit court should have allowed her to introduce evidence of other similar incidents involving the same or a substantially similar seat-belt buckle. We *165 address each of these issues below.[2]
1. Reference to insurance during opening statements
During the defendant's opening statement, Toyota's counsel said the following to the jury:
This vehicle was not preserved post-accident. How did that happen? It happened because about three months after the accident, Ms. Cantrell signed over the title to her Tundra to her insurance company[.]
Cantrell's counsel immediately moved for a mistrial, arguing that "mentioning Arkansas liability insurance in this matter is not proper[;]" consequently, the jury "is contemplating an insurance settlement may or may not have occurred and there is nothing [he] can do to fix it." Toyota's counsel responded that "Cantrell's insurance is not an issue here," and that he made the statement-apparently in furtherance of Toyota's case for spoliation of the windshield-to explain "why [Cantrell] signed over title." The circuit court denied Cantrell's motion for a mistrial and gave the following instruction to the jury:
I will remind you that the statements of counsel made during opening statements are not evidence and therefore, I am going to remind you that you don't treat them as evidence. Secondly, we're not going to have any more conversations about disposition of the vehicle or how the vehicle was disposed of. We're not going to deal with that any more. Disregard any statements about disposition of the vehicle.
Additionally, the circuit court later stated the following on the record:
I have considered the issue raised by the motion for mistrial. The motion for mistrial as to the issue of insurance is denied for the same reasons that I denied it previously.
All of the cases that have been shown to me involve reference[s] to insurance that were made during the course of evidence. Not a single case was presented to the Court that involved a situation where insurance was mentioned in opening statement or closing argument, which ... the jury instructions plainly indicate are not evidence.
Cantrell now appeals the circuit court's denial of her motion for a mistrial, arguing that the circuit court's instruction distinguishing the statements of counsel from evidence was insufficient to cure the prejudice that resulted from the reference to her insurance. We hold that the circuit court did not abuse its discretion by denying Cantrell's motion for a mistrial.
This court does not reverse the denial of a motion for a mistrial in the absence of an abuse of discretion or manifest prejudice to the movant. Milner , 2011 Ark. App. 297, at 3, 384 S.W.3d at 3. Additionally, "[a] mistrial is a drastic remedy that should be granted only when there has been an error so prejudicial that justice cannot be served by continuing the trial, or when the fundamental fairness of the trial itself has been manifestly affected." Id. at 4, 384 S.W.3d at 4.
Further, "[a]s a general rule, it is improper for either party to introduce or elicit evidence of the other party's insurance coverage," and "[t]he injection of insurance coverage is proper only when it is relevant to some issue in the case."
*166 Synergy Gas Corp. v. Lindsey , 311 Ark. 265, 269, 843 S.W.2d 825, 828 (1992). "The crux of the matter ... is whether ... the reference to insurance is relevant to an issue or is designed to skew the jury's thinking because of the presence or absence of a deep pocket." Id. at 269, 843 S.W.2d at 828 (internal quotation marks omitted). The supreme court has held that a mistrial is the proper remedy when there is "an intentional and deliberate reference to insurance when it [is] not an issue in the case and when the opposing party [has] not opened the door for its admission[.]" Id.
The reference to Cantrell's insurance company was deliberate to the extent that counsel made it-by his own admission-to explain "why [Cantrell] disposed of the vehicle and failed to preserve it." Cantrell is also quite correct that Toyota's counsel could have made the same point by invoking a generic third party in place of Cantrell's insurance company. Additionally, Cantrell's suggestion that Toyota's counsel should have known to avoid the reference is well taken, because "[t]he rule against mentioning insurance when it is not relevant is well known in this state." Hacker v. Hall , 296 Ark. 571, 576, 759 S.W.2d 32, 35 (1988).
Nevertheless, we cannot agree that the circuit court abused its discretion by denying the motion for a mistrial. It does not appear that the reference, while deliberate, "was designed to skew the jury's thinking because of the presence or absence of a deep pocket," Synergy Gas Corp. , 311 Ark. at 269, 843 S.W.2d at 828, and for that reason, it is not at all like the closing argument in Vermillion v. Peterson , 275 Ark. 367, 368, 630 S.W.2d 30, 30 (1982), or the questions pursuing responses about the parties' insurance coverage in Hacker , 296 Ark. at 575-77, 759 S.W.2d at 35, and Synergy Gas Corp. , 311 Ark. at 268-69, 843 S.W.2d at 828. Moreover, it was a brief reference to insurance during an opening statement of a two-week trial; therefore, is more akin to the brief display of the letter containing the words "insurance company" that did not warrant a mistrial in Milner , 2011 Ark. App. 297, at 5, 384 S.W.3d at 4. Accordingly, the circuit court did not abuse its discretion by denying Cantrell's motion for a mistrial. Toyota's counsel, however, should take caution at retrial to avoid such a reference. The argument to this court that the reference was relevant to explain the condition of the Tundra is belied by the argument that the alleged destruction of evidence occurred after the insurance company had returned custody of the Tundra to Cantrell.
2. Corporal Cleary Chapman
Corporal Chapman testified that he was the first state trooper on the scene of the accident. When he arrived, he found that EMTs had already moved Ms. Cantrell to an ambulance. Corporal Chapman's investigation of the scene revealed, consistent with other testimony, that Cantrell's Tundra rolled twice after striking the median barrier. The corporal testified that he did not examine the Tundra's seat belts during his investigation, and he was not a "seat-belt expert of any kind." Nevertheless, over Cantrell's objection, the circuit court allowed Corporal Chapman to testify on cross-examination that "based on [his] investigation into [the] accident, [he] determined that [Cantrell] was not wearing her seat belt." Cantrell now contends that the circuit court erred because Corporal Chapman was not qualified to give that opinion. We agree.
Rule 701 of the Arkansas Rules of Evidence provides that "[i]f a witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which *167 are (1) [r]ationally based on the perception of the witness; and (2) [h]elpful to a clear understanding of his testimony or the determination of a fact in issue." Opinion testimony that embraces an ultimate issue, however, is properly admitted only if the opinion is "otherwise admissible." Ark. R. Evid. 704 (2017).
Corporal Chapman's opinion fails to meet the first criterion of Rule 701 because it is based only on a fireman's hearsay report that Cantrell was found outside the vehicle when emergency services arrived. Even overlooking the secondhand nature of the report, the information that Cantrell was ejected from the vehicle would-at most-allow Corporal Chapman to give an opinion on a point that neither party disputes-that Cantrell was unrestrained at some point during the accident. To be qualified to give an opinion on the ultimate issue in the case-whether Cantrell was unrestrained because she was not wearing a seat belt (or because the seat belt failed)-Corporal Chapman had to personally observe facts bearing on that issue. He did not, since he admitted that he did not examine the seat belt or, it appears, observe the types and locations of Cantrell's injuries. Accordingly, the circuit court erred when it permitted Corporal Chapman to give his opinion that Cantrell was not wearing her seat belt at the time of the accident.
3. Lucy Claeys
Ms. Claeys is Ms. Cantrell's former sister-in-law whose video-recorded deposition was played for the jury at trial. According to the parties, Ms. Claeys testified on direct examination that she saw Cantrell's seat belt in an unlatched and stowed condition when she and another family member viewed the Tundra shortly after the accident.[3] She apparently also testified that Cantrell urged her to lie regarding the appearance of the seat belt, as well as the frequency of her seat-belt use.
Cantrell sought to impeach Ms. Claeys's video-recorded direct examination in two ways. First, Cantrell wanted to introduce the testimony of Pastor Greg Mills, who would have testified about the events that ensued after Ms. Claeys told him that her new husband was selling drugs and abusing her children. According to Pastor Mills, Ms. Claeys was hostile toward Cantrell's family after her first husband died, and she had the mistaken impression that Cantrell, rather than Pastor Mills, called the Department of Humans Services (DHS) to report the alleged child abuse and drug use. Second, Cantrell sought to introduce portions of the deposition in which she cross-examined Ms. Claeys about the contents of the report and her mistaken belief that Cantrell made the report to DHS. Applying Arkansas Rule of Evidence 608(b), the circuit court granted Toyota's motion in limine regarding Pastor Mills's testimony and denied Cantrell's request to cross-examine Ms. Claeys about the details of the report. Cantrell now argues that the circuit court abused its discretion because Pastor Mills's testimony about the events underlying the DHS report, as well as Ms. Claeys's misplaced hostility toward Cantrell, was admissible evidence of Ms. Claeys's bias against her.
As an initial matter, "impeachment by proof of conduct under Rule 608(b) is a separate matter from impeachment by proof of bias," Fowler v. State , 339 Ark. 207, 219, 5 S.W.3d 10, 16 (1999), and the arguments below, as well as the circuit court's rulings, appear to have conflated *168 the two. Because it nonetheless appears that Cantrell advanced her current argument that Pastor Mills's testimony was admissible as proof of bias, we address it here.
In civil and criminal cases alike, "evidence of a witness's bias or prejudice is not a collateral matter, and if a witness denies or does not fully admit the facts claimed to show bias, the attacker has a right to prove those facts by extrinsic evidence." Wood v. White , 311 Ark. 168, 170, 842 S.W.2d 24, 26 (1992). Moreover, "hostility of a witness toward a party is evidence of bias and may be shown by the fact that the witness has had a fight or quarrel with the party." Id. at 170, 842 S.W.2d at 26. The circuit court did not err by excluding Pastor Mills's testimony.
A circuit court has wide latitude to impose reasonable limits on cross-examination based on concerns over confusion of the issues, see Gordon v. State , 326 Ark. 90, 93, 931 S.W.2d 91, 94 (1996), and the circuit court was within that discretion when it limited Cantrell's predicate questions about Ms. Claeys's bias to whether there was "an acrimonious or unpleasant relationship" between them. Additionally, Cantrell did not establish the foundation for admitting Pastor Mills's testimony because Ms. Claeys acknowledged her hostile relationship with Cantrell on cross-examination. The circuit court, therefore, did not abuse its discretion.
4. Expert witnesses
Cantrell next contends that the circuit court erred when it "arbitrarily curtailed [her] counsel's attempt to establish [the] background and qualifications" of her expert witnesses, Mr. Syson and Dr. Burton. The record demonstrates, however, that both experts testified extensively about their background and qualifications, and the circuit court simply exercised its wide discretion to limit further inquiry on an undisputed issue. See Ark. R. Evid. 610(a) (2017) (requiring courts to exercise reasonable control over the interrogation of witnesses and presentation of evidence to avoid needless consumption of time, among other things). Cantrell's argument, therefore, lacks merit.
5. Other similar incidents
Before trial, Toyota filed a motion in limine to exclude evidence of other rollover accidents involving seat-belt buckles that were either identical or substantially similar to the QSS buckle in Cantrell's 2000 Tundra. The first accident-called the Denmark case-involved a 1996 Geo Prism that had the same seat-belt system and QSS buckle as Cantrell's 2000 Toyota Tundra. Cantrell alleged that the QSS buckle in the Prism released during a rollover after a severe ground impact to the wheels. The second accident, the Oliver case, involved a 1998 Toyota Camry that had the same QSS buckle as the 2000 Tundra. Cantrell alleged that the Camry "rolled over and it suffered an impact on the wheels, directly onto the wheels during that rollover, which caused the seat-belt buckle to unlatch much like the forces in [the Cantrell] accident." The third accident, called the Robinson case, involved a Toyota 4Runner that had a Tokai Rika buckle that according to Cantrell, was "built to the same design drawing as the QSS buckle involved in [the Cantrell] case, and that Tokai Rika buckle unlatched due to inertial forces during a ground impact which removed the wheel[.]" Finally, the Rodriguez case involved a 2000 Toyota Tundra, like Cantrell's, that had the same seat-belt system and buckle. As in the other accidents, the seat belt became unlatched during a rollover accident.
Cantrell sought to introduce the evidence of the other accidents during Mr. *169 Syson's testimony. During his voir dire examination, Mr. Syson explained that he would testify about an inertial-release scenario in which "the forces that caused the buckle to release ... are transmitted up ... to the buckle through the stalk ... from the frame of the vehicle." After explaining that the accidents involved essentially the same buckle, Mr. Syson also testified on cross-examination that the Camry in the Oliver case has "a different body structure [and] different chassis than Cantrell's Tundra." In particular, the Camry "has a different buckle stalk" than Cantrell's Tundra, and the Camry is a unibody vehicle that does not have "a traditional ladder frame" like the Tundra. Likewise, the Geo Prism in the Denmark case was a sedan akin to the Toyota Corolla that, like the Camry, had a buckle stalk that was shorter than the stalk in Cantrell's Tundra. Mr. Syson also conceded that the Tokia Rika buckle's mechanism was not identical to the mechanism in the QSS buckle, and the rollover accident in the Rodriguez case, which did involve a 2000 Toyota Tundra, had several circumstances that were not present in Cantrell's accident; most notably that the truck in Rodriguez rolled over as it towed a loaded U-Haul trailer down a steep hill.
The circuit court denied the motion in limine, initially ruling, in pertinent part, as follows:
[T]he Supreme Court in [ Ford Motor Co. v. Massey , 313 Ark. 345, 855 S.W.2d 897 (1993) ] dealt with the identical nature of the equipment at issue and in this-in the instant case, case before me, [Cantrell] contend[s] that the seat-belt mechanism involved in Ms. Cantrell's case are substantially similar to the seat-belt mechanisms in Oliver, Rodriguez-Russo-there was a third one-Denmark and Robinson.
....
As I heard the witness's testimony, I heard reference to whether or not the makeup of the seat-belt mechanism was plastic or the witness appears to take the view that the makeup of the seat-belt mechanism in the cases were substantial-were substantially the same, although the dynamics of the collisions or the accidents that occurred were different.
Based on that, I'm going to allow the witness to testify as to those [incidents] and find that the plaintiffs have laid an adequate foundation to allow the witness to testify. That's the [c]ourt's ruling.
Nevertheless, the circuit court later changed its ruling on the Oliver , Denmark , and Robinson accidents and permitted Mr. Syson to testify only about the Rodriguez accident involving a 2000 Toyota Tundra. After Cantrell proffered the circumstances of each of those accidents, the circuit court explained its ruling as follows:
The Court's ruling as to the other similar incidents through Mr. Syson was that the other similar incidents were not substantially similar to Ms. Cantrell's vehicle so as to pass the relevancy test.
For purposes of the record, a 1997 Geo Prism, a 1998 Toyota Camry are both passenger sedans, compact, subcompact passenger sedans, which the witnesses have testified talked about the particular rollover tendency of light trucks and high center of gravity vehicles.
And with regards to a Toyota 4Runner, there had been no showing that the Toyota 4Runner was a substantial[ly] similar vehicle to Ms. Cantrell's vehicle so as to meet the foundational standard of relevancy as to that.
On appeal, Cantrell argues that the circuit court abused its discretion when it reversed its initial ruling and excluded Mr. Syson's proffered testimony regarding the *170 accidents in Oliver , Denmark , and Robinson. Specifically, Cantrell argues that she met her burden of showing substantial similarity when she established that the Oliver and Denmark accidents involved the same QSS buckle that was in her Tundra and when she established that the Robinson accident involved a buckle whose mechanism was substantially similar to the QSS buckle. Toyota asserts in response that the accidents were not substantially similar because they involved different vehicle frames, different seat-belt stalks, and, in the Robinson case, a different type of buckle.
" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Ark. R. Evid. 401 (2017). "Although relevant," however, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" Ark. R. Evid. 403.
Generally, "evidence of similar occurrences is admissible only upon a showing that the events arose out of the same or substantially similar circumstances." Ford Motor Co. v. Massey , 313 Ark. 345, 354, 855 S.W.2d 897, 902 (1993). "The burden rests on the party offering the evidence to prove that the necessary similarity of conditions exists." Id. at 354, 855 S.W.2d at 902. Additionally, "the relevancy of such evidence is within the [circuit court's] discretion, subject to reversal only if an abuse of discretion is demonstrated." Id. at 354-55, 855 S.W.2d at 902.
"Whether an occurrence is substantially similar to the matter at hand depends on the underlying theory of the case." Id. at 354-55, 855 S.W.2d at 902. "For example, evidence submitted to demonstrate a dangerous condition necessitates a high degree of similarity because it weighs directly on the ultimate issue to be decided by the jury." Id. "[T]he requirement of substantial similarity is relaxed," however, "when the evidence of other incidents is used to show notice or awareness of a potential defect in the product." Id.
The circuit court did not abuse its discretion when it excluded Mr. Syson's testimony about the rollover accidents in the Oliver , Denmark , and Robinson cases. Cantrell's theory for proving the buckle's defective condition depended on the transmission of gravitational forces through the frame of the vehicle to the buckle stalk. While the Oliver , Denmark , and Robinson cases involved the same or substantially similar seat-belt buckles, there were notable differences in the length of the buckle stalks and the frames of the vehicles involved. The Rodriguez case, on the other hand, involved a 2000 Toyota Tundra that obviously had the same buckle, stalk, and frame as the Tundra that was at issue in Cantrell's case. Under these circumstances, we cannot say that the circuit court acted "thoughtlessly, improvidently, or without due consideration." Milner , 2011 Ark. App. 297, at 3, 384 S.W.3d at 3, when it limited Mr. Syson's testimony to the rollover accident that occurred in Rodriguez.
III. Toyota's Cross-Appeal
Finally, Toyota conditionally cross-appeals the circuit court's denial of its motion for a directed verdict, arguing that Cantrell failed to introduce substantial evidence establishing that the seat-belt buckle was defective. Because Toyota's argument attacks the weight of the evidence, rather than its sufficiency, we affirm the circuit court's denial of the motion for a directed verdict.
*171 "In determining whether a directed verdict should have been granted, [the court] reviews the evidence in a light most favorable to the party against whom the verdict is sought and give[s] it its highest probative value, taking into account all reasonable inferences deducible from it." Morehart v. Dillard Dep't Stores , 322 Ark. 290, 292, 908 S.W.2d 331, 333 (1995). Additionally, "[a] motion for a directed verdict should be granted only if there is no substantial evidence to support a jury verdict." Id. at 292, 908 S.W.2d at 333. "When the evidence is such that fair-minded persons might reach different conclusions, then a jury question is presented[.]" Id. Applying these deferential standards of review, we affirm the circuit court's denial of Toyota's motion for a directed verdict.
Toyota principally argues that Cantrell failed to prove that the Tundra's seat-belt buckle was defective because she failed to introduce any evidence that the Delrin spring in her seat-belt buckle was broken or sagging, or that the gravitational forces of her accident reached the level that Mr. Syson testified was necessary for the buckle to inertially unlatch. Looking at the evidence in the light most favorable to Cantrell, however, Mr. Syson testified that according to his tests, a QSS buckle like the one installed in Cantrell's Tundra became inertially unlatched at forces less than those that were present in Cantrell's rollover accident. He further testified that the buckle was prone to fatigue, and his inspection of the buckle in Cantrell's Tundra indicated that she habitually used her seat belt. Cantrell also offered evidence that she had been restrained by her seat belt at some point during the accident, and despite that, she was ejected from the vehicle. Indeed, it appears that Toyota's attack on the sufficiency of the evidence goes more to the weight of Mr. Syson's expert testimony, which is a matter for a jury. See Wal-Mart Stores, Inc. v. Williams , 71 Ark. App. 211, 215, 29 S.W.3d 754, 756 (2000). Accordingly, the circuit court's denial of Toyota's motion for a directed verdict is affirmed.
IV. Conclusion
Because we hold that the circuit court abused its discretion when it submitted Toyota's spoliation instruction to the jury, we reverse and remand the case for a new trial. The circuit court's denial of Toyota's motion for a directed verdict is affirmed on Toyota's cross-appeal because Toyota's challenge goes more to the weight of the evidence rather than its sufficiency.
Reversed and remanded on direct appeal; affirmed on cross-appeal.
Vaught and Murphy, JJ., agree.

One additional issue, an allegation that the circuit court demonstrated prejudicial bias against Cantrell's counsel, is not preserved for our review. See Neumann v. Smith , 2016 Ark. App. 14, at 15, 480 S.W.3d 197, 206.

While Ms. Claeys's cross-examination was transcribed for the record, her direct examination, for whatever reason, was not. See Ark. Sup. Ct. Admin. Order No. 4(a).